STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. JAMES MADISON, DEFENDANT–APPELLANT.

Argued October 13, 1987—Decided February 2, 1988.

224

*Carl D. Poplar* argued the cause for appellant (*Poplar & Florio,* attorneys).

*Meredith A. Coté,* Deputy Attorney General, argued the cause for respondent (*W. Cary Edwards,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

GARIBALDI, J.

The issue in this appeal is whether the out-of-court photographic identification procedures used by the police were "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States,* 390 *U.S.* 377, 384, 88 *S.Ct.* 967, 971, 19 *L.Ed.*2d 1247, 1253 (1968). The State's case against the defendant-appellant, James Madison, as one of the three men who robbed a movie theatre is based primarily on the pretrial and in-court identifications of the defendant by one of the victims, Brian Mason. Approximately two months after the robbery, Mr. Mason was summoned to the police station where he was shown twenty-four black-and-white photographs, containing at least one photograph of the defendant. There is a dispute between the police officer who conducted the photographic array, Detective Rago, and Mr. Mason over whether Mr. Mason was able to identify the defendant from this group of black-and-white photographs. Detective Rago testified that Mr. Mason did not identify the defendant in any black-and-white photograph; Mr. Mason insists that he did.

After being shown the twenty-four black-and-white photographs, Mr. Mason was shown approximately thirty-eight color photographs taken at defendant's birthday party. Defendant, wearing a pink shirt, appeared approximately thirteen or fourteen times in these pictures. Other men also appeared more than once in these pictures. From one of these color photographs, Mr. Mason identified the defendant as one of the men

who robbed the theatre. A *Wade* [1] hearing was held to determine the admissibility of the out-of-court identification of the defendant by Mr. Mason. The identification was ruled admissible.

A jury convicted defendant of armed robbery (*N.J.S.A.* 2C:15–1), terroristic threats (*N.J.S.A.* 2C:12–3), possession of a weapon for an unlawful purpose (*N.J.S.A.* 2C:39–4(a)), and possession of a handgun without a permit (*N.J.S.A.* 2C:39–5(b)).

The defendant appealed to the Appellate Division on the ground that the out-of-court photographic identification procedures were "so impermissibly suggestive" that he was denied due process of law. *Simmons v. United States, supra,* 390 *U.S.* 377, 88 *S.Ct.* 967, 19 *L.Ed.*2d 1247; *State v. Thompson,* 59 *N.J.* 396, 414 (1971). Defendant claimed that both Mr. Mason's out-of-court and in-court identifications of him should have been excluded from evidence. The trial court found that the out-of-court identification procedures were not impermissibly suggestive. Hence, it did not reach the question of whether those procedures were so unduly prejudicial as to have fatally tainted Mr. Mason's pretrial and in-court identifications of the defendant. The Appellate Division found that the manner in which the out-of-court photographic array was conducted was "unquestionably suggestive," but concluded nevertheless that the procedure did not give rise to a likelihood of misidentification. The Appellate Division thus concluded that the trial court properly admitted both Mr. Mason's out-of-court and in-court identifications of the defendant.

We granted defendant's petition for certification, 107 *N.J.* 662 (1987).

I

On the evening of February 5, 1984, three black men committed an armed robbery at a movie theatre in Cherry Hill, New

---

[1]*United States v. Wade,* 388 *U.S.* 218, 87 *S.Ct.* 1926, 18 *L.Ed.*2d 1149 (1967).

Jersey. The evidence at trial established that at approximately 10:30 p.m. on that evening, two employees of the theatre, Mr. DeMatea, the doorman, and Ms. Smith, who sold candy in the theatre, were talking in the lobby. Mr. DeMatea noticed two black men enter the theatre and was about to inquire what they wanted when he noticed a third black male coming from the area of the public telephones. Believing that the two men were only waiting for their friend to use the telephone, Mr. DeMatea turned back to continue his conversation with Ms. Smith. Immediately thereafter, the shortest and most light-skinned[2] of the three males approached Ms. Smith and then grabbed her by the arms. He pulled a gun and placed it on Smith's back and told both employees to do nothing or he would "blow [their] brains out." Ms. Smith grabbed Mr. DeMatea and began to cry. The other two males remained standing near the doors approximately twenty feet away. All three men had guns.

The men told DeMatea and Smith to take them to the theatre's office upstairs. Once upstairs, the robbers shoved Mr. DeMatea and Ms. Smith into a storage closet and told them not to leave or they would be shot. Mr. DeMatea testified that approximately three minutes passed between the time Ms. Smith was grabbed and the time that they were placed in the closet.

At both the *Wade* hearing and at the trial, Mr. Mason testified that he was the manager of the theatre and at approximately 10:30 p.m. on February 5, 1984, he and Ms. Cianfrani, the cashier, were in the office next to the storage room counting the night's receipts. Just as he was counting the concession money, a man, allegedly the defendant, came into the office, grabbed the money on the desk, and put a gun to Mr. Mason's head, threatening to blow his brains out if he did not open the safe. Because he was nervous, Mr. Mason testified

---

[2]The parties are in agreement that this light-skinned and shorter male is not the man claimed to be the defendant.

that he had difficulty opening the safe. The robber told Mr. Mason to hurry up and repeated his threat.

After Mr. Mason opened the safe, the robber directed him to stand back and hand him a nearby coin bag used for gathering the money. He then told Mr. Mason to sit down. The robber then put his gun back in his coat and as he left stated to both employees: "Don't forget, I have a friend." Mr. Mason testified that the entire incident lasted approximately ten to fifteen minutes.

Ms. Cianfrani testified that while one robber ordered Mr. Mason to open the safe in the office, another one "stayed at the door and he was standing directly in front of me. He held a gun straight in front of me and it was fairly close to my face...."

After approximately ten minutes in the storage closet, hearing no sounds from the hallway, Mr. DeMatea slowly opened the door. Seeing no one in the hallway, he walked into the office and saw Mr. Mason and Ms. Cianfrani seated at their desks. The police were called and the four employees gave formal statements to the police on the night of the robbery.

A few days after the robbery, Mr. Mason gave a description to the police from which a composite picture was drawn. Mr. Mason was shown the completed composite picture that was marked into evidence. Shortly after the robbery, Mr. Mason viewed photographs at the theatre. He did not identify the defendant in any of the pictures shown to him at the theatre. In fact, it is unclear from the record whether the photographs viewed at the theatre even contained a photograph of the defendant.

The identification procedure in question took place on April 3, 1984, approximately two months after the robbery. On that day, Mr. Mason was summoned to the Cherry Hill police station. Mr. Mason met with three detectives of the Philadelphia Police Department and one detective of the Cherry Hill Police Department. Two officers, Detective Rago of the Philadelphia

Police Department and Detective Grady of the Cherry Hill Police Department, spoke to Mr. Mason. Mr. Mason testified that he was informed by Detective Grady that "[t]here were detectives from Philadelphia who had photographs of a man who they might believe was the man who held us up."

Detective Rago of the Philadelphia Police Department conducted the photographic array. When Detective Rago assembled these pictures he had never looked at the composite made by the Cherry Hill Police Department nor had he been provided by the Cherry Hill police with any information regarding the description of the perpetrators. Detective Rago became involved in the theatre robbery investigation as part of a longer, ongoing investigation into a series of crimes committed in Philadelphia. He testified that he assembled the photographs because "my investigation had revealed to me what I felt to be prime suspects in a series of incidents."

Mason was told not to pick a picture unless he felt "positive about it." Detective Rago testified that initially he displayed to Mr. Mason three folders containing twenty-four black-and-white photographs all of black males of similar complexion most being between the ages of twenty-five and thirty years old. Each folder contained eight pictures. Defendant's photograph was included in the black-and-white photographs. At both the *Wade* hearing and at the trial, Detective Rago testified that Mr. Mason did not select a picture from the black-and-white photographs. Mr. Mason insists that he did identify the defendant in a black-and-white photograph.

Mr. Mason then was shown two albums that contained approximately thirty-eight color photographs. Detective Rago advised Mr. Mason that the photographs were in color and were of individuals in a more natural setting. The pictures were taken at defendant's birthday party. He appeared in thirteen or fourteen out of the total number of thirty-eight photographs, in ten photographs with one to two other individuals, once each with three others and four others, and twice with six others.

There were other black males in the color photographs who also appeared more than once.

Mr. Mason identified the defendant in only one color photograph. The picture that Mason identified consisted of two men, and the other person in the picture was also in a photograph in the black-and-white photographic array. Mason distinguished the defendant from the other man by noting that the defendant was wearing a pink shirt.

On September 17, 1985, more than nineteen months after the robbery, a *Wade* hearing was held. At the hearing only Mr. Mason and Detective Rago testified. At the *Wade* hearing, and later at trial, Detective Rago testified that Mason was with him for about fifteen or twenty minutes, that it took Mason about two or three minutes to look at the black-and-white photographs and about four or five minutes to look at the color photographs. According to Detective Rago, his combined time of reviewing the pictures was somewhere between six and ten minutes. Mason contradicted this testimony and claimed that it took him about one hour or one hour-and-a-half to look through all the pictures.

Mr. Mason testified at the *Wade* hearing that the light in the office where the robbery took place was good, that the person who threatened him had stood about three feet away from him, and that he had no trouble seeing the perpetrator. He stated that the entire robbery took approximately ten to fifteen minutes. While there were minutes when he did not observe the robber, Mason testified that he did observe him for some five to ten minutes. He also testified that he was shocked and scared during the robbery. At trial, Mr. Mason described the man as black, in his mid-twenties, approximately six feet tall with a mustache. He also stated the man was wearing nothing on his head.

At trial, both Mr. Mason and Detective Rago substantially reiterated their earlier *Wade* hearing testimony. At both the *Wade* hearing and at trial, Mr. Mason identified the color

picture of the defendant he had chosen from the photographic lineup by acknowledging his signature and the date and time on the back of the picture. Once in the courtroom, he identified defendant as the individual in the picture and the person who robbed him.

At the trial, the other three employees of the theatre present on the night of the robbery also testified. Mr. DeMatea testified that he "got a good look at all three" robbers but that he looked mostly at the shorter of the three. Indeed, he provided the description of the light-skinned, shorter man to the police. Before the trial, DeMatea looked at "a lot of pictures" but was unable to identify anyone. At the trial, DeMatea made a positive identification of the defendant as one of the robbers. At both the *Wade* hearing and the trial, there were two black males sitting at the defense counsel's table; one was the defendant and the other was a sheriff's officer, dressed in a sheriff's uniform. Ms. Smith apparently was never shown any pictures and could not identify anyone at the trial as being involved in the robbery. Ms. Cianfrani was also unable to make an in-court identification, and could not identify anyone when shown pictures prior to trial.

## II

The United States Supreme Court has long expressed its concerns regarding the unreliability of eyewitness identification. In *Simmons v. United States, supra,* the Court stated:

It must be recognized that improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals. A witness may have obtained only a brief glimpse of a criminal, or may have seen him under poor conditions.... This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, *or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in someway emphasized.* The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime. [390 *U.S.* at 383–84, 88 *S.Ct.* at 971, 19 *L.Ed.*2d at 1253 (emphasis added, footnote omitted).]

■ While "it is well known that eyewitness evidence is inherently suspect and that suggestive procedures may prejudicially affect the ultimate identification," it is equally well recognized that in criminal actions an eyewitness's identification may be the most crucial evidence. W. LaFave & J. Israel, *Criminal Procedure*, § 7.4 at 320 (1985). Indeed, some criminal prosecutions can be proven only through the use of the testimony of an eyewitness. In its struggle to balance the State's need to use eyewitness identification against the defendant's need to protect himself against potentially unreliable eyewitness testimony, the Supreme Court, in a series of cases, developed a two-prong test to determine the admissibility into evidence of an eyewitness's identification. *Manson v. Brathwaite*, 432 *U.S.* 98, 97 *S.Ct.* 2243, 53 *L.Ed.*2d 140 (1977); *Neil v. Biggers*, 409 *U.S.* 188, 93 *S.Ct.* 375, 34 *L.Ed.*2d 401 (1972); *Foster v. California*, 394 *U.S.* 440, 89 *S.Ct.* 1127, 22 *L.Ed.*2d 402 (1969); *Simmons v. United States, supra*, 390 *U.S.* 377, 88 *S.Ct.* 967, 19 *L.Ed.*2d 1247; *Stovall v. Denno*, 388 *U.S.* 293, 87 *S.Ct.* 1967, 18 *L.Ed.*2d 1199 (1967).

In conducting the Supreme Court's two-step analysis, a court must first decide whether the procedure in question was in fact impermissibly suggestive. If the court does find the procedure impermissibly suggestive, it must then decide whether the objectionable procedure resulted in a "very substantial likelihood of irreparable misidentification." *Simmons v. United States, supra*, 390 *U.S.* at 384, 88 *S.Ct.* at 971, 19 *L.Ed.*2d at 1253; *accord Neil v. Biggers, supra*, 409 *U.S.* at 199–201, 93 *S.Ct.* at 382–383, 34 *L.Ed.*2d at 411; *Stovall v. Denno, supra*, 388 *U.S.* at 302, 87 *S.Ct.* at 1972, 18 *L.Ed.*2d at 1206. In carrying out the second part of the analysis, the court will focus on the reliability of the identification. If the court finds that the identification is reliable despite the impermissibly suggestive nature of the procedure, the identification may be admitted into evidence. "Reliability is the linchpin in determining the admissibility of identification testimony...." *Manson v. Brathwaite, supra*, 432 *U.S.* at 114, 97 *S.Ct.* at 2253, 53

*L.Ed.*2d at 154. The reliability determination is to be made from the totality of the circumstances adduced in the particular case. *Neil v. Biggers, supra,* 409 *U.S.* at 199, 93 *S.Ct.* at 382, 34 *L.Ed.*2d at 411.

We have consistently followed the Supreme Court's analysis on whether out-of-court and in-court identifications are admissible into evidence. *State v. Ford,* 79 *N.J.* 136, 137 (1979) (Pashman, J., concurring) ("the court must determine whether there are sufficient indicia of reliability to outweigh the 'corrupting effect of the suggestive identification itself' ") (quoting *Manson v. Brathwaite, supra,* 432 *U.S.* at 114, 97 *S.Ct.* at 2253, 53 *L.Ed.*2d at 154); *State v. Farrow,* 61 *N.J.* 434, 447–48 (1972), *cert.* den., 410 *U.S.* 937, 93 *S.Ct.* 1396, 35 *L.Ed.*2d 602 (1973) (quoting *Simmons v. United States, supra,* 390 *U.S.* at 384, 88 *S.Ct.* at 971, 19 *L.Ed.*2d at 1253); *State v. Thompson,* 59 *N.J.* 396, 414 (1971) (quoting *Simmons v. United States, supra,* 390 *U.S.* at 384, 88 *S.Ct.* at 971, 19 *L.Ed.*2d at 1253); *State v. Matlack,* 49 *N.J.* 491, 498, 499 (citing *Stovall v. Denno, supra,* 388 *U.S.* 293, 87 *S.Ct.* 1967, 18 *L.Ed.*2d 1199) *cert.* den., 389 *U.S.* 1009, 88 *S.Ct.* 572, 19 *L.Ed.*2d 606 (1967); *State v. Catlow,* 206 *N.J.Super.* 186, 192 (App.Div.1985) (quoting *Simmons v. United States, supra,* 390 *U.S.* at 384, 88 *S.Ct.* at 971, 19 *L.Ed.*2d at 1253), certif. den., 103 *N.J.* 465 and 103 *N.J.* 466 (1986).

### III

The case against the defendant rests primarily on the out-of-court and in-court identifications of the defendant by Mr. Mason. Therefore, if Mr. Mason's identifications of defendant were improperly admitted into evidence, the error cannot be deemed harmless.

Our first inquiry, therefore, is whether the pretrial identification procedures used at the police station on April 3, 1984, were impermissibly suggestive. In *State v. Farrow, supra,* we stated:

> Impermissive suggestibility is to be determined by the totality of the circumstances of the identification. It is to be stressed that the determination can only be reached so as to require the exclusion of the evidence where all the circumstances lead forcefully to the conclusion that *the identification was not actually that of the eyewitness, but was imposed upon him so that a substantial likelihood of irreparable misidentification can be said to exist.* [61 *N.J.* at 451 (emphasis added).]

The trial court found that the pretrial identification procedures were not impermissibly suggestive. The Appellate Division concluded that while the procedures employed were "unquestionably suggestive," they did not give rise to a likelihood of misidentification. We, too, find that the pretrial identification procedures were impermissibly suggestive.

Approximately two months after the robbery, Mr. Mason was called to the police station. Before he viewed the pictures, he was informed that "there were detectives from Philadelphia who had photographs of a man who they might believe was the man who held us up." "A statement of the police that a suspect is included in the photographic array ... should be considered in determining whether it was unduly suggestive...." *State v. Austin,* 195 *Conn.* 496, 488 *A.*2d 1250, 1253 (1985). Here, however, there is no evidence that the detectives attempted to influence Mr. Mason's choice by any other statements. Thus, this statement alone is not sufficient to support the conclusion that the pretrial identification procedures were unduly suggestive. *See State v. Williams,* 203 *Conn.* 159, 177, 523 *A.*2d 1284, 1296 (1987) ("Nowhere in the record is there any evidence that the police expressly informed the victim that a suspect's photograph was included in a particular display."). *But see People v. Carter,* 415 *Mich.* 558, 330 *N.W.*2d 314, 334 (1982) (identification was not suggestive despite allegation that police officer stated that he had a suspect in mind).

It is the sheer repetition of defendant's picture that forces us to conclude that the out-of-court procedures were impermissibly suggestive. Initially, defendant was shown twenty-four black-and-white photographs. A single photograph of the defendant was included in this group of twenty-four mug shots. As noted

earlier, there is some conflict in the testimony over whether Mason was able to identify defendant's picture from the black-and-white photos: Mason stated that he was able to identify defendant from those pictures, while Detective Rago testified that he was not. The trial court made no determination of whether Mason had selected defendant's picture from the black-and-white photographs. Accordingly, we are unable to determine from the record whether Mr. Mason did select defendant's picture from the black-and-white photo array. What is clear, however, is that after Mr. Mason reviewed the twenty-four black-and-white photographs, Detective Rago showed him thirty-eight color photographs, thirteen or fourteen of which depicted defendant as the center of attention at a birthday celebration held in his honor.

In *Simmons v. United States, supra,* 390 *U.S.* at 385, 88 *S.Ct.* at 972, 19 *L.Ed.*2d at 1254, the witnesses to a robbery were shown group photographs in which petitioner and another alleged bank robber appeared several times. The Court recognized that "the identification procedure employed may have in some respects fallen short of the ideal." *Id.* at 385–86, 88 *S.Ct.* at 972, 19 *L.Ed.*2d at 1254 (footnote omitted). The Court also acknowledged that

> it probably would have been preferable for the witnesses to have been shown more than six snapshots, for those snapshots to have pictured a greater number of individuals, and *for there to have been proportionally fewer pictures of [petitioner].*
>
> [*Id.* at 386 n. 6, 88 *S.Ct.* at 972 n. 6, 19 *L.Ed.*2d at 1254 n. 6 (emphasis added).]

A number of courts have expressed the concern that the repetition of a defendant's photograph can cause a suggestive identification. *See, e.g., United States v. Higginbotham,* 539 *F.*2d 17, 23 (9th Cir.1976) ("the repeated showing to a witness of photographic displays for the purpose of identification presents opportunities for abuse and due process problems"); *State v. Williams, supra,* 203 *Conn.* at 175, 523 *A.*2d at 1295 ("the inclusion of multiple photographs of a suspect in an array may be suggestive, because it increases the risk of misidentification") (citations omitted); *State v. Miller,* 202 *Conn.* 463, 522

*A.*2d 249, 255 (1987) ("pictorial recurrence can be suggestive because it increases the risk of misidentification") (citation omitted); *Commonwealth v. Mayo,* 21 *Mass.App.Ct.* 212, 486 *N.E.*2d 84, 87 (1985) (court was "mindful of the 'danger of misidentification' where a defendant's photograph is included in successive arrays shown to a witness") (citations omitted), review den., 396 *Mass.* 1105, 488 *N.E.*2d 1179 (1986); *People v. Williams,* 60 *Ill.*2d 1, 322 *N.E.*2d 819, 824 (1975) ("the use of multiple, identical or obviously similar, photographs of the same person is normally an undesirable photographic identification procedure which may often be unduly suggestive"); W. La-Fave & J. Israel, *Criminal Procedure,* § 7.4 at 341 (1985) ("the array should not be arranged so that a particular individual stands out").

While acknowledging that a different photographic identification procedure may be preferable, other courts have concluded that where more than one photograph of a defendant is shown to a witness, or the same photograph is shown more than once, evidence of the photographic identification may nonetheless be admissible. *Simmons v. United States, supra,* 390 *U.S.* at 385–86, 88 *S.Ct.* at 972, 19 *L.Ed.*2d at 1254 (at least six photographs were shown to witnesses and defendant appeared "several" times in them); *State v. Thompson, supra,* 59 *N.J.* at 412, 414 (trial court did not err in admitting photographic identification, where defendant appeared in two photographs out of an array of seven photographs shown to witness); *State v. Andrial,* 203 *N.J.Super.* 1, 7, 8 (App.Div.1985) (where defendant appeared in three photographs out of an array of eighty-five photographs, court could not say that inclusion of three photographs "was in any way unduly suggestive"); *State v. Miller,* 159 *N.J.Super.* 552, 561 (App.Div.1978) (where defendant appeared in "up to four photos of himself among the various arrays," held: "[t]he procedures followed in the out-of-court identifications were questionable" but likelihood of misidentification was minimal); *State v. Williams, supra,* 203 *Conn.* at 172–173, 176, 523 *A.*2d at 1293–1294, 1295 (procedures

were not unnecessarily suggestive, where defendant appeared in two photographs but witness had viewed "several hundred photographs"); *Commonwealth v. Avery*, 12 *Mass.App.* 97, 421 *N.E.*2d 787, 790 (1981) (fact that defendant appeared in three of eighteen photographs "while not above criticism, does not require a finding of suggestiveness if the procedure, taken as a whole, was fair") (citations omitted); *People v. Williams, supra*, 60 *Ill.*2d at 9–10, 322 *N.E.*2d at 824 (held: identification procedure was not suggestive, where defendant appeared in three photographs in array of eight photographs).

In those cases in which the identification procedure has not been found impermissibly suggestive despite the repetition of the defendant's photo, the witnesses have generally been able to identify the defendant in each of the pictures in which he appeared. *See, e.g., State v. Thompson, supra*, 59 *N.J.* at 412–13 (witness identified two photographs of defendant despite the fact that defendant looked different in them); *State v. Catlow, supra*, 206 *N.J.Super.* at 190 (witness picked defendant's photograph each time in the course of two photographic lineups); *State v. Andrial, supra*, 203 *N.J.Super.* at 5 (witness identified three photographs of defendant despite the fact that defendant looked somewhat different in them); *State v. Lutz*, 165 *N.J.Super.* 278, 287 (App.Div.1979) (witness picked defendant's photograph each time in the course of two photographic lineups, despite the fact that the photograph was slightly altered for the second lineup); *State v. Williams, supra*, 523 *A.*2d at 1294 (witness identified two photographs of defendant in array); *Commonwealth v. Mayo, supra*, 486 *N.E.*2d at 86 (witness identified, in three different arrays, photographs of defendant despite the fact that he looked somewhat different in them); *People v. Williams, supra*, 60 *Ill.*2d at 6–7, 322 *N.E.*2d at 822–23 (witness identified three photographs of defendant despite the fact that defendant looked somewhat different in them).

■ In the instant case, Mason was able to identify the defendant in only one of the thirteen or fourteen color photographs. This is so despite the fact that these pictures were taken at the same time and in the same context, *i.e.*, the defendant's birthday party. Mason's inability to identify defendant in all the photographs in which he appeared strongly suggests to us that his identification could have been the product of an impermissibly suggestive procedure. Acting against this assumption is the fact that certain individuals other than defendant also appeared in more than one of the photographs. The fact that an eyewitness has been shown a photo array containing multiple photographs of other individuals has been used to support a finding that the identification was not impermissibly suggestive. *See Simmons v. United States, supra,* 390 *U.S.* at 385–86, 88 *S.Ct.* at 972, 19 *L.Ed.*2d at 1254; *Commonwealth v. Avery, supra,* 12 *Mass.App.* at 102, 421 *N.E.*2d at 790 ("The defendant was not the only person with multiple photographs in the array."); *People v. Hughes,* 124 *A.D.*2d 344, 507 *N.Y.S.*2d 285, 287 (1986), *appeal* den., 69 *N.Y.*2d 828, 513 *N.Y.S.*2d 1035, 506 *N.E.*2d 546 (1987) ("[D]efendant was not the only individual whose picture was repeated. At least one other individual's picture was repeated."). The record does not disclose how many people in addition to the defendant appeared in more than one picture or how often such individuals appeared in other pictures. However, there is no suggestion that any other person appeared in the photographic array as frequently as the defendant. It was, after all, his birthday party.

Counsel does not refer to any New Jersey case in which a witness has been shown so many photographs of a defendant. Moreover, there is no explanation in the record of why less suggestive procedures were not used in this case, *e.g.*, the use of fewer pictures of the defendant. There is no claim by the State that these suggestive procedures were necessary because the law enforcement authorities were faced with an emergency that required an immediate identification. *See Simmons v.*

*United States, supra,* 390 *U.S.* at 384–85, 88 *S.Ct.* at 971, 19 *L.Ed.*2d at 1253–1254 (use of repetitive photographs justified due to law enforcement's necessity to deploy their forces within a few hours of the crime); *Stovall v. Denno, supra,* 388 *U.S.* at 302, 87 *S.Ct.* at 1972, 18 *L.Ed.*2d at 1206 (one-man lineup at hospital justified due to grave illness of victim).

We therefore conclude that the procedures followed in the out-of-court identification of defendant were impermissibly suggestive due to the unnecessary inclusion of multiple photographs of the defendant.

## IV

The danger of highly suggestive out-of-court identification procedures is that they may "give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States, supra,* 390 *U.S.* at 384, 88 *S.Ct.* at 971, 19 *L.Ed.*2d at 1253. We turn, therefore, to a determination of whether the impermissibly suggestive out-of-court identification procedures so irreparably "tainted" the out-of-court and in-court identifications of the defendant that he was denied due process. In so doing, we "must determine whether there are sufficient indicia of reliability to outweigh the 'corrupting effect of the suggestive identification itself.'" *State v. Ford, supra,* 79 *N.J.* at 137 (quoting *Manson v. Brathwaite, supra,* 432 *U.S.* at 114, 97 *S.Ct.* at 2253, 53 *L.Ed.*2d at 154).

The United States Supreme Court has established that the reliability determination is to be made from the totality of the circumstances in the particular case. *Manson v. Brathwaite, supra,* 432 *U.S.* at 114, 97 *S.Ct.* at 2253, 53 *L.Ed.*2d at 154; *Neil v. Biggers, supra,* 409 *U.S.* at 199, 93 *S.Ct.* at 382, 34 *L.Ed.*2d at 411. This involves considering the facts of each case and weighing the corruptive influence of the suggestive identification against the "opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal,

the level of certainty demonstrated at the time of the confrontation and the time between the crime and the confrontation." *Manson v. Brathwaite, supra,* 432 *U.S.* at 114, 97 *S.Ct.* at 2253, 53 *L.Ed.*2d at 154 (citing *Neil v. Biggers, supra,* 409 *U.S.* at 199, 93 *S.Ct.* at 382, 34 *L.Ed.*2d at 411). New Jersey courts have adopted the "totality of the circumstances" test in determining the reliability of a witness's identification, and have also held that the factors listed in *Manson* must be weighed against the corrupting effect of the suggestive procedure. *State v. Carter,* 91 *N.J.* 86, 129–30 (1982) (quoting *Neil v. Biggers, supra,* 409 *U.S.* at 199, 93 *S.Ct.* at 382, 34 *L.Ed.*2d at 411); *State v. Ford, supra,* 79 *N.J.* at 137 (Pashman, J., concurring) (quoting *Manson v. Brathwaite, supra,* 432 *U.S.* at 114, 97 *S.Ct.* at 2253, 53 *L.Ed.*2d at 154); *State v. Thompson, supra,* 59 *N.J.* at 414 (citing *Simmons v. United States,* 390 *U.S.* at 384, 88 *S.Ct.* at 971, 19 *L.Ed.*2d at 1253); *State v. Farrow, supra,* 61 *N.J.* at 447, 451. In conducting our analysis of the instant case, therefore, we will focus our attention on the *Manson* factors. Our assessment of those factors will determine whether the reliability of the identification is such that it outweighs the prejudicial effects of the impermissibly suggestive procedure.

The only independent source for the witness's, Mr. Mason's, out-of-court and in-court identifications was the robbery itself. Mr. Mason testified that his encounter with the alleged robber lasted ten to fifteen minutes. He further testified that the light in the theatre office was good, and that he had a good opportunity to view the defendant. Mason also testified that during the robbery he was shocked, scared, and nervous, a normal reaction under the circumstances.

From the record we are unable to determine whether Mr. Mason provided an accurate description of the defendant to the police. The composite that was created from Mr. Mason's description was, according to him, an accurate representation of the man who held a gun to his head. The defendant, however, urges that the composite does not resemble him. The defense

alleges that the photographs of the defendant and the composite depict different individuals. If the composite picture does accurately represent the defendant, it supports the State's position that Mr. Mason did indeed recall the defendant prior to and independent from the identification procedures. The trial court, however, made no finding of whether the composite accurately resembles the defendant.

When asked whether Mason expressed any degree of certainty at the identification, Detective Rago testified that "he stated to me that this was the male." Mason was also examined on the selection of defendant's photograph:

Q. Is this the picture you selected?

A. Yes.

Q. Is the man in that picture the man who held the gun to your head and robbed you that night?

A. Yes.

Mason also distinguished defendant from the other person who was in the picture with him by stating that defendant was wearing a pink shirt. However, Mason was able to identify defendant in only one photograph, while at least thirteen or fourteen photographs of defendant were shown to him during the identification. We are disturbed by the fact that Mason was apparently able to identify the defendant in only one of the recurring photographs in the array. This fact causes us to question the reliability of the identification, particularly since a number of cases seem to indicate that a witness who is presented with a photo array containing multiple photographs of a defendant will generally identify the defendant in each of the recurring pictures. Mason, however, testified that he was close to the assailant—close enough to provide a description for the composite—under conditions that would give him an opportunity to see what he looked like. Mason appears to have demonstrated certainty in his testimony. Nevertheless, "a witness' feeling of confidence in the details of memory generally do not validly measure the accuracy of the recollection." W. LeFave & J. Israel, *supra*, § 7.1 at 322. In fact, witnesses "frequently

become more confident of the correctness of their memory over time while the actual memory trace is probably decaying." *Id.*

Approximately two months transpired between the crime and the time of the identification. Evidence of identification has been admitted by some courts even if the length of time between the crime and the identification is longer than two months. *Neil v. Biggers, supra,* 409 *U.S.* at 201, 93 *S.Ct.* at 383, 34 *L.Ed.*2d at 412 (evidence of identification admissible despite lapse of "seven months between the rape and the [identification]"); *State v. Miller, supra,* 202 *Conn.* at 471, 475, 522 *A.*2d at 254, 256 (evidence of identification was admissible despite the fact that victim identified defendant's photograph eight months after assault). The passing of time should nevertheless be a consideration:

> Considerable memory loss occurs during the many days—and often months— that typically elapse between the offense and an eyewitness identification of the suspect. Memory is a constructive process to which details may be added which were not present in the initial representation or in the event itself. [W. LaFave & J. Israel, *supra,* § 7.1 at 322.]

A two month time lapse without more, however, does not cause us to conclude that the evidence of identification is inadmissible.

Mr. Mason also made an in-court identification of the defendant. Even if the out-of-court identification process used is found to be suggestive and inadmissible, it does not necessarily follow that the witness's in-court identification is so tainted that it too will be inadmissible. In *Simmons v. United States, supra,* 390 *U.S.* at 384, 88 *S.Ct.* at 971, 19 *L.Ed.*2d at 1253, the Supreme Court held that

> convictions based on eyewitness identification *at trial* following a pretrial identification by photograph will be set aside on that ground only if *the photographic identification* procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. [emphasis added.]

The Court in *State v. Thompson, supra,* 59 *N.J.* at 418–19, is in accord:

> If ... the out-of-court procedures were so impermissibly suggestive as to fix in the victim's mind an identity probably based upon photographs rather than upon an independent mental picture of the person gained from observations of

him at the time of commission of the crime, the in-court identification should be excluded.

In determining the reliability of an in-court identification we again apply the *Manson* factors. In this case, the only basis for Mr. Mason's in-court identification of the defendant was his ability to observe the defendant at the scene of the crime. Therefore, the preceding discussion concerning the reliability of Mr. Mason's out-of-court identification, *supra* at 239, is equally applicable to his in-court identification. We also note that the *Wade* hearing in this case occurred immediately prior to the commencement of the trial. At the *Wade* hearing, Mr. Mason confirmed his identification of the defendant's photograph, as well as his identification of the defendant as the person who committed the crime. The confirmation by Mr. Mason of his identification of defendant's photograph unavoidably influenced Mr. Mason's out-of-court and in-court identifications of the defendant, and under the circumstances made his identifications "all but inevitable." *Foster v. California, supra,* 394 *U.S.* at 443, 89 *S.Ct.* at 1129, 22 *L.Ed.*2d at 407.

Mr. DeMatea also made an in-court identification of the defendant. He, however, had been unable to identify any of the robbers from a photo array after viewing "a lot of pictures." The record is not clear on whether Mr. DeMatea was ever shown a photograph of the defendant. Because the defendant was the only person sitting at the defense table who reasonably could have been the defendant, Mr. DeMatea's in-court identification is extremely suggestive:

If a one-on-one confrontation at the police station is highly suggestive, then surely such a confrontation in court is the most suggestive situation of all, for the witness is given an even stronger impression that the authorities are already satisfied that they have the right man.
[W. LaFave & J. Israel, *supra,* § 7.4 at 341–42.]

Moreover, none of the indicia of reliability that exist with respect to Mr. Mason's out-of-court identification exists with respect to DeMatea's in-court identification. Although DeMatea testified that he "got a good look" at all three assailants, he mostly concentrated on the shorter, more light-skinned of them.

It was initially the shorter of the three gunmen who threatened DeMatea. There is no evidence in the record that Mr. DeMatea ever gave the police a description of the defendant. DeMatea's entire opportunity to view any of the robbers was very limited. He testified that no more than three minutes elapsed between the time that he and Ms. Smith were accosted and the time that they were placed in the closet. Although DeMatea was able to identify the defendant in court with some apparent certainty, his in-court identification took place nineteen months after the crime took place.

Weighing all these factors against the corrupting effects of the suggestive procedures, we think the likelihood of misidentification with respect to Mr. Mason's and Mr. DeMatea's identifications is great. The out-of-court procedures used with respect to Mr. Mason's identification of defendant were highly suggestive. Indeed, in no New Jersey case have such highly suggestive procedures been used.[3] Nonetheless, there are unresolved factual issues that bear on whether Mr. Mason had an independent source for his identifications. Hence, based on the record before us, we are unable to determine whether Mr. Mason's identifications had an independent, reliable basis. Since the trial court at the *Wade* hearing determined that the out-of-court identification procedures were not impermissibly suggestive, it made no findings on whether the out-of-court or in-court identifications would be tainted by the procedure. Although a trial court is required to reach the issue of "taint" only if it first finds that the identification process was unduly suggestive, it has been suggested that in order to avoid a remand a court should make a finding of taint even if the procedure is found to be fair. *Clemons v. United States,* 408 *F.*2d 1230, 1237 (D.C.Cir.1968), *cert.* den., 394 *U.S.* 964, 89 *S.Ct.* 1318, 22 *L.Ed.*2d 567 (1969); *State v. Cooper,* 165 *N.J.Super.* 57, 66 (App.Div.1979). When the identification procedures are

---

[3]Indeed, we have been unable to find any court decision (state or federal) in which similar repetitive techniques were utilized.

as questionable as those present in this case, better practice would be for the trial court to hold a taint hearing and make specific findings of fact on the independent reliability of the identifications.

Additionally, it is helpful to an appellate court if a trial court sets forth its specific findings on why it deems a photographic array not impermissibly suggestive, particularly one as suggestive as the one at issue. Here, for example, the trial court failed to make specific findings at the *Wade* hearing regarding disputed issues, *i.e.*, whether the composite picture accurately resembled the defendant; whether Mr. Mason had selected defendant's picture from the black-and-white photographic array; how long Mr. Mason had actually viewed the pictures; and how many and how often other men appeared in the color photographs. The absence of such specific findings by the trial court "unduly complicates appellate review." *State v. Cooper, supra,* 165 *N.J.Super.* at 67.

We therefore think that the appropriate remedy in this case is to remand to the trial court for a taint hearing to determine whether the identifications of Mr. Mason had an independent source. Since we find the pretrial identification procedures to be impermissibly suggestive, the State has the burden of proving by clear and convincing evidence that the identifications by Mr. Mason had a source independent of the police-conducted identification procedures. *United States v. Wade, supra,* 388 *U.S.* at 240, 87 *S.Ct.* at 1939, 18 *L.Ed.*2d at 1164; *State v. Cooper, supra,* 165 *N.J.Super.* at 66. The *Manson* weighing process mandates that the evidence of independent reliability increase in direct proportion to the corruptive influence of the suggestive identification procedure. In view of our determination that the corruptive influence of the photographic identification procedure in this case is substantial, the State's burden is formidable. If the trial court finds that Mr. Mason's identification has an independent source, then the conviction should be affirmed. If the trial court finds that Mr.

Mason's identification does not have an independent source, since its admission into evidence was not harmless error, defendant's conviction must be vacated and there must be a new trial.

Accordingly, we do not reverse the conviction, but modify the judgment of the Appellate Division and remand to the trial court for further proceedings consistent with this opinion. We do not retain jurisdiction.

*For modification and remandment*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Reversal*—None.