**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1661-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

ALFRED D. HOLLAWAY,
a/k/a ALFRED HOLLAWAY,

     Defendant-Appellant.

_____

Submitted April 9, 2024 – Decided April 26, 2024

Before Judges Gooden Brown, Haas and Bergman.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 21-01-0031.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Alison Gifford, Assistant Deputy Public Defender, of counsel and on the brief).

Matthew J. Platkin, Attorney General for the State of New Jersey, attorney for respondent (Deborah Cronin Bartolomey, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

Defendant Alfred Hollaway appeals from an order denying his motion to suppress an out-of-court identification made by an undercover police officer after an evidentiary hearing.

Following the denial of his motion, defendant entered a conditional guilty plea to N.J.S.A. 2C:39-9(i), transporting a firearm to unlawfully dispose of it to another person, and to N.J.S.A. 2C:39-5(j), unlawful possession of a firearm with a prior armed robbery conviction. As part of the plea agreement, all other charges against defendant in the indictment were dismissed. Thereafter, the court heard and denied defendant's motion to withdraw his guilty plea. This appeal followed.

Defendant raises the following singular point on appeal:

> POINT I
>
> THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS THE UNDER COVER OFFICER'S OUT-OF-COURT IDENTIFICATION

Having considered this argument in light of the record and applicable legal principles, we affirm.

I.

The record developed at the <u>Wade/Henderson</u> hearing[1] held by the trial court in this matter reflects the following.

On June 11, 2020, an undercover officer ("UCO") was working as part of the Middlesex County Prosecutor's Office Narcotics Task Force Unit. ("Task Force"). At approximately 4:44 p.m., the UCO was in the parking lot of a South Plainfield shopping mall to engage in a narcotics transaction with Tyrell Coffey. When Coffey arrived, the UCO talked with him about the drug transaction and they also spoke about purchasing a firearm. Coffey informed the UCO that he had an AK-47 with three magazines for sale and that the UCO would need to "get the money right away" if he wanted to purchase the gun. After negotiating a price, the two reached an agreement for the UCO to purchase the gun and magazines for $1300. They agreed that the UCO would obtain the money immediately and Coffey would return with the gun. Although the UCO had been part of hundreds of undercover narcotics operations, this was his first gun purchase.

Once Coffey left, the UCO went to the post-purchase location to obtain the funds and discuss the transaction with other detectives. At around 5:37 p.m.,

---

[1] <u>United States v. Wade</u>, 388 U.S. 218 (1967); <u>State v. Henderson</u>, 208 N.J. 208 (2011).

the UCO returned to the parking lot to purchase the gun. He parked his car and waited while a surveillance unit monitored the exchange. Approximately fifteen minutes later, Coffey arrived with a female passenger in the same silver Cadillac he was driving earlier. A red Hyundai was trailing him. Coffey parked his car in front of the UCO's car and the red Hyundai parked next to the UCO. The UCO could see that a Black male was driving the Hyundai, whom he later identified as defendant. He relayed a description of the driver and the car to his surveillance unit.

All three men exited their vehicles and met at the back of the Hyundai. Defendant asked the UCO, "where's the money", and he replied by asking, "where's the weapon". All three men were standing close together at the back of the Hyundai. There was still daylight at the time.

Defendant opened the trunk and popped the vehicle liner to show the UCO a blue bag with a black trash bag inside. Defendant opened the bags to show the gun inside the trash bag and then gave the gun to Coffey, who put the gun in the UCO's car. The UCO gave the money to Coffey. Thereafter, the three men talked about future gun purchases and they told the UCO that selling guns is "what [they] do . . . [They]'ll take care of it."

A-1661-22

After the exchange, the UCO returned to his car and provided descriptions of the gun seller to the surveillance unit, describing defendant as "Black male, gray beard, black t-shirt, kind of tall" and the red Hyundai as having a Tennessee tag.

The UCO left the parking lot and went to the post-purchase location to meet with additional detectives to secure the weapon. He told detectives to stay with the Hyundai to attempt to identify defendant because at that time he did not know the name of the driver. Thereafter, the UCO went to Task Force headquarters. Defendant remained in the parking lot and appeared to be sleeping in the red Hyundai.

At headquarters, other detectives were attempting to identify the driver, and although at the hearing the UCO testified he did not recall assisting them, Detective Anthony Pacillo testified that the UCO was "assisting in the lookups". Detective Pacillo was also working for the Task Force and participated in the undercover operation. He was part of the surveillance unit acting as lead investigator. Detective Pacillo observed the drug and gun transactions made by the UCO and could see Coffey and defendant from a distance but could not make out any distinguishing characteristics.

5

Detective Pacillo obtained the red Hyundai's license plate number from another detective and ran the license plate. The car was registered as a rental from Enterprise. Detectives contacted Enterprise and found that the renter was Shermaine Green. Defendant, Alfred Hollaway was listed as an additional driver on the rental car agreement. A criminal history search revealed a recent arrest of Hollaway in Pennsylvania. Detectives obtained a booking photo from the Pennsylvania agency at 9:00 p.m. on June 11, 2020.

Detective Pacillo testified he showed the photograph to the UCO within three to five minutes after receiving it, without saying anything "specific other than . . . is this him or whatever." The UCO said "yeah, that's the guy. . . that's him" referring to the man he had just purchased the gun from approximately three hours earlier. The UCO signed and dated the back of the photo to record the positive identification.

The UCO testified that there was "no doubt in [his] mind" that the man in the photo was the seller. Detective Pacillo testified that he is familiar with photographic arrays, but he did not use that type of procedure because it "doesn't . . . pertain to [a] law enforcement [identification]". The UCO prepared a report dated July 2, 2020, concerning the operation and stated that his normal practice was to write his reports within a day or two of the operation and upload it later.

6

There was no official record made of the identification procedure other than the UCO's report. The time between the UCO's interaction with defendant and Detective Pacillo showing him the photograph was slightly more than three hours.

The hearing record indicates the UCO's training included attending and instructing several undercover trainings including the Attorney General Top Gun case agent training, the Unit School and the FBI/State Police School. At these trainings, he was taught how to focus on suspects during transactions involving anywhere from one to ten people and to recount the event in a report the day of an event or the following day to preserve his recollection of the interaction. As part of his duties as an instructor at the Unit School and FBI/State Police School, he taught undercover officers-in-training. He trained them what to look for when meeting people during an undercover investigation, how to pay attention, how to stay in the moment and how to be alert. In his time as a UCO, he took part in wiretap investigations, met with targets to observe transactions, bought drugs, guns, and fake licenses, and participated in surveillance operations. He was the primary undercover officer in a recent case where the Task Force dismantled a higher network drug organization.

7

Additionally, the UCO observed and spoke to defendant for several minutes during the interaction even before the gun was visible. Also, the UCO knew that he would be responsible for identifying the suspect at a later point and knew to make direct observations of him.

II.

In support of his motion, defendant asserted that the identification was insufficiently recorded in the UCO's July 2, 2020 report. Defendant also criticized the UCO's ability to recall the interaction because he originally thought the red Hyundai was a Sonata rather than an Elantra and because he was under additional stress as this was his first undercover firearm purchase and he did not have sufficient time to observe the seller. Defendant also claimed that some of Detective Pacillo's reported observations were given to him by other detectives so they were not reliable. Defendant argued that the identification was unreliable based on the totality of the circumstances and it should be suppressed. Defendant further argues that the trial court failed to properly consider the variables determining the reliability of an identification set forth in Henderson.

The State argues that the motion was properly denied because defendant did not show that the procedure created a sufficient likelihood of irreparable

misidentification.  In support of its argument the identification was reliable, the State posited the UCO was not a civilian witness but was a trained undercover officer and an instructor to other officers concerning appropriate procedures in an undercover operation.

## III.

In reviewing a grant or denial of a motion to suppress, we "must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." State v. Lamb, 218 N.J. 300, 313 (2014).  Factual findings are accorded deference because they "are substantially influenced by [the trial court's] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Elders, 192 N.J. 224, 244 (2007) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)).  Therefore, the trial court's findings on the admissibility of identification evidence are "entitled to very considerable weight." State v. Farrow, 61 N.J. 434, 451 (1972).  A finding that the identification procedures were reliable should not be disturbed unless they fail the sufficient credible evidence standard of review.  State v. Adams, 194 N.J. 186, 203 (2008).

The purpose of a Wade/Henderson hearing is for the trial court to determine whether an identification procedure created a substantial likelihood

of irreparable misidentification, such that the identification was unreliable and should be suppressed at trial. Wade, 388 U.S. at 229-230. New Jersey adopted this principle in Henderson, 208 N.J. at 289.

To obtain a pretrial Wade/Henderson hearing, "a defendant has the initial burden of showing some evidence of suggestiveness that could lead to a mistaken identification." Henderson, 208 N.J. at 288. The evidence must be tied to some system variable – usually law enforcement conduct – and not an estimator variable. Id. at 288-89. Next, the State must offer proof that the eyewitness identification was reliable. Id. at 189. Finally, the ultimate burden is "on the defendant to prove a very substantial likelihood of irreparable misidentification." Ibid. The third part of the test is taken from New Jersey's previous test articulated in State v. Madison, and the court considers the relevant system and estimator variables when determining whether a defendant has met their burden. 109 N.J. 223, 239 (1988); Henderson, 208 N.J. at 291.

System variables are variables within the control of the legal system, and estimator variables are out of the legal system's control. Henderson, 208 N.J. at 247. In Henderson, the Court listed system variables for eyewitness identifications as: blind administration, pre-identification instructions, lineup construction, feedback, recording confidence, multiple viewings, show up

10

timeline, private actors, and other identifications made.   Id. 289-91.

Additionally, the Court listed estimator variables as: stress, weapon focus, duration, distance and lighting, witness characteristics, perpetrator characteristics, memory decay, race-bias, opportunity to view the criminal, degree of attention, accuracy of prior descriptions, level of certainty demonstrated at identification before feedback, and time between the crime and confrontation.   Id. at 291-93.

Although a show-up identification process typically is "inherently suggestive," the display of a single suspect in a photographic identification is not impermissibly suggestive when it occurs "on or near the scene . . . 'before memory has faded.'"  State v. Herrera, 187 N.J. 493, 504 (2006) (citing State v. Wilkerson, 60 N.J. 452, 461 (1972)).   On or near-the-scene identifications "facilitate and enhance fast and effective police action[,]" because they are likely to be accurate and to avoid inconvenience for witnesses.   Ibid.

The risk of misidentification is not heightened when the identification occurs "within two hours of an event."  State v. Pressley, 232 N.J. 587, 592 (2018).  The court in Pressley declined to answer whether an identification made by a law enforcement officer should be evaluated under the same standards as a civilian eyewitness.  Id. at 591.  However, in State v. Little, a case with similar

11

facts to <u>Pressley</u>, we observed that "[t]here can be no dispute that a trained undercover police officer has heightened awareness of the need for proper identification of persons who engage in drug purveyance." 296 N.J. Super. 573, 580 (App. Div. 1997).

IV.

Having carefully considered the entire record and applicable law, we determine that the trial judge's findings were based on sufficient, credible evidence in the hearing record and his denial of defendant's motion to suppress the UCO's identification was appropriate.

In his written decision denying defendant's motion to suppress, the judge cited to the <u>Manson/Madison</u>[2] factors. Although our Court supplemented the standards of <u>Manson/ Madison</u> in <u>Henderson</u>, we are convinced the evidence and factual findings the trial judge relied upon adequately addressed the factors as required by <u>Henderson</u>. 208 N.J. 208 (2011).

Initially, the court held an evidentiary hearing concerning the identification, implicitly determining the "show-up" identification showed some

---

[2] See <u>Manson v. Braithwaite</u>, 432 U.S. 98 (1977); <u>State v. Madison</u>, 109 N.J. 223 (1988).

evidence of suggestiveness under the first prong of <u>Henderson</u>. At the hearing, testimony was taken which was relevant to the system and estimator variables.

The trial judge found the identification was reliable based upon the following findings. The judge found that the identification procedure in the undercover operation "was not so inherently suggestive that it fail[ed] to pass the preliminary inquiry of non-suggestiveness." The judge found that based on the registration information for the red Hyundai defendant was observed driving, detectives worked to "piece together his identity starting with the vehicle['s] rental information". This led them to conduct an NCIC search which produced a booking photograph from an arrest of defendant in Pennsylvania. The trial judge determined when the photo was shown to the UCO a "mere three hours after the controlled purchase," the conditions under which the UCO observed defendant make clear that presenting the UCO with the photograph to identify defendant was a "reasonable substitution for an in person show-up, a line up, or a photo array."

The judge found the UCO was operating as part of a Task Force along with other surveillance personnel, whose duties included the identification of the driver of the red Hyundai. The judge also determined the show-up methodology employed by the Task Force officers "was not so suggestive as to

13

fail the first inquiry of admissibility." The findings by the trial judge cited Detective Pacillo's testimony as credible as he did not say anything to the UCO other than "is this him?" The judge also found Detective Pacillo did not disclose to the UCO that the photo depicted the additional driver listed on the Hyundai's rental agreement.

The judge stated that the UCO was "an experienced officer, trained as an illicit-drug-activity investigator with hundreds of controlled purchases involving a number of different forms of contraband." In addition to his training, the judge noted that the UCO had a strong incentive to be observant. Also, the judge found the conditions were ideal for the UCO to observe defendant, making findings that it was sunny and bright outside and the UCO was already familiar with Coffey due to their previous interactions. The judge added the transaction took several minutes to complete during which time the UCO had an unhindered line of sight and multiple opportunities to view defendant.

Recognizing the show-up identification procedure may create the likelihood of misidentification, the trial judge determined that the UCO was also working with the investigation team to identify the driver as compared to a civilian witness. The judge determined the UCO knew who and what he was

14

looking for while the search was pending because he had just directly observed defendant approximately three hours prior to his identification.

After a thorough review of the record, we determine the judge's findings which applied the system and estimator variables were based on sufficient credible evidence in the record and support the judge's denial of defendant's motion.

The UCO was an experienced undercover officer who had participated in hundreds of undercover operations in his career. While this was his first gun sale and his stress level may have been moderately heightened, this was not his first undercover operation as he had participated in hundreds of undercover operations. He attended several trainings to become an undercover officer and was an instructor to other officers-in-training on how to focus on and identify individuals involved in undercover operations. His training prepared him for undercover situations involving identifying up to ten individuals. He knew going into the operation that he would need to later identify the seller of the gun, and even told his surveillance unit while he was completing the sale to investigate the red Hyundai's tags to obtain an identification.

15

We have determined that an undercover officer has heightened awareness of the importance of a proper identification, as compared to a civilian eyewitness. Little, 296 N.J. Super at 580.

In this instance, the gun purchase transaction took place over a sufficient period of time where the UCO was able to clearly observe defendant. The UCO had ideal viewing conditions during the firearm sale. Both Detective Pacillo and the UCO testified it was still light out when the transaction occurred at around 6:00 p.m. The interaction lasted several minutes, during many of which defendant was standing close to the UCO and speaking to him. He had ample opportunity to note defendant's face and appearance and commit it to memory.

Although a gun was present, there was no evidence in the record that the gun was being used to threaten the UCO or anyone else. The gun was the subject matter of the sale and was contained in a bag and unloaded at the time of the exchange. The evidence presented at the hearing showed the UCO had three distinct opportunities to view defendant without the distraction of the firearm being visible. The first, when defendant pulled the red Hyundai into the parking spot next to his car. The second, when all three men exited their vehicles to begin the transaction and exchanged words. The third, after the gun was secured in his vehicle and the men talked about future gun purchases.

A-1661-22

Additionally, the UCO had already met with Coffey earlier in the day, therefore it was less likely he would have been distracted in trying to remember features and descriptions of both men. His primary concerns during the transaction were to purchase the gun and observe defendant for later identification.

We note there was a negative factor concerning the reliability of the UCO's identification which was the additional one-hour time difference exceeding the two-hour window articulated as guidance in Henderson and Pressley. Nonetheless, when considering the other evidence supporting the reliability of the identification, we conclude the excess time was insignificant when weighed against the other cumulative evidence supporting the overall reliability of the identification. The UCO was still actively working to assist the investigation unit in identifying defendant during the three-hour period. There was no gap where he began working on another case or through his shift ending, which could have caused a lapse of memory or his focus to move elsewhere.

The UCO testified "without a doubt" the photograph depicted the seller of the firearm. He immediately signed and dated the photograph to record the positive identification, indicating that he was certain this was the man from which he purchased the gun.

17

While the trial judge did not directly cite <u>Henderson</u> in his written decision, the record shows his rulings clearly considered the factors required under the case including the relevant system and estimator variables. When applying the standards required by <u>Henderson</u> to the trial judge's findings, we conclude his determination the UCO's identification was reliable, is based on sufficient, credible evidence in the hearing record.

In addition, after our in-depth review of the record including the trial judge's factual findings addressed previously, we also determine based on those same reasons, there was not sufficient, credible evidence proffered by defendant that the identification procedure created a sufficient likelihood of irreparable misidentification as required by <u>Henderson</u>.

To the extent we have not otherwise addressed defendant's arguments, they are without sufficient merit to warrant discussion in a written opinion. <u>Rule R.</u> 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

18                                                          A-1661-22