**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5288-17

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

TARIQ THOMPSON,
a/k/a TOWON COON,
TARIK NELSON, and
TAIRQ G. THOMPSON,

      Defendant-Appellant.

_____

Argued December 14, 2021 – Decided March 2, 2022

Before Judges Rothstadt, Mayer and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 17-07-1891.

Rochelle Watson, Deputy Public Defender II, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Rochelle Watson, of counsel and on the briefs).

Lucille M. Rosano, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Theodore N. Stephens II, Acting Essex

County Prosecutor; Lucille M. Rosano, of counsel and on the brief).

PER CURIAM

Defendant Tariq Thompson appeals from his June 13, 2018 conviction and sentence that were entered after a jury found him guilty of second-degree robbery, N.J.S.A. 2C:15-1(a)(2), and the disorderly persons offense of theft by unlawful taking, N.J.S.A. 2C:20-3(a). Defendant received an aggregate sentence of ten years, subject to an eighty-five percent period of parole ineligibility under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

On appeal, he argues the following points.

> POINT I
>
> BECAUSE THE POLICE LACKED AN OBJECTIVELY REASONABLE BASIS FOR BELIEVING THAT 1207 SPRINGFIELD AVENUE WAS ABANDONED, THE TRIAL JUDGE ERRED IN DENYING THE MOTION TO SUPPRESS.
>
> POINT II
>
> THE TRIAL COURT ERRED IN FAILING TO SUPPRESS THE VICTIM'S IDENTIFICATION OR, ALTERNATIVELY, GRANTING THE REQUEST FOR A WADE[1] HEARING BECAUSE THERE WAS NO AUDIO, VIDEO, OR WRITTEN VERBATIM ACCOUNT OF THE IDENTIFICATION PROCEDURE, AND BASED ON THE LIMITED

---

[1] United States v. Wade, 388 U.S. 218 (1967).

RECORD THAT DOES EXIST, THE SHOW-UP PROCEDURE WAS IMPERMISSIBLY SUGGESTIVE.

POINT III

THE COURT ERRED IN PERMITTING THE VICTIM'S WIFE TO MAKE AN IN-COURT IDENTIFICATION OF DEFENDANT, WHERE SHE HAD NEVER PREVIOUSLY MADE AN OUT-OF-COURT IDENTIFICATION, BECAUSE IT WAS HIGHLY SUGGESTIVE AND UNRELIABLE.

POINT IV

THE TRIAL COURT ERRED (1) IN IMPOSING A TEN-YEAR SENTENCE FOR THIS SECOND-DEGREE ROBBERY, WHICH WAS AT THE LOW END OF THE SEVERITY SPECTRUM, AS FOUND BY THE JURY; (2) IN CONSIDERING DEFENDANT'S PRIOR ARRESTS; AND (3) IN GIVING SIGNIFICANT WEIGHT TO THE PSYCHOLOGICAL EFFECT OF THE INCIDENT ON DEFENDANT'S FAMILY.

For the reasons stated in this opinion, we conclude there is merit only to defendant's contention about his entitlement to a Wade/Henderson[2] hearing. We remand the matter to the trial court to conduct that hearing and, depending upon the outcome, to determine whether to vacate defendant's conviction. In all other aspects, we affirm.

---

[2] State v. Henderson, 208 N.J. 208 (2011).

A-5288-17

I.

The facts leading to defendant's conviction as developed at trial are summarized as follows. On April 15, 2017, Jose Garro, accompanied by his wife Joy[3] and their young sons, went to a restaurant to pick up take-out food. Joy parked in the rear parking lot of the restaurant shortly after midnight, and remained in the car with the children, with the engine running and the headlights on, while Jose ran into the restaurant to place the order.

As Jose walked toward the restaurant, a man, who Jose identified at trial as defendant, approached him in the entryway and asked him for a cigarette. Jose testified that although there was a "low level" of lighting, he could see defendant's face. He described defendant as a short, black man with a beard, who was wearing blue jeans and a blue baseball-style jacket with "letters" on it. Jose told defendant that he did not smoke and continued into the restaurant.

After placing the order, Jose returned to the car and stood by the open driver's side car window, talking to Joy. Joy noticed a man, who she identified for the first time at trial as defendant, "walking around the parking lot," but he did not enter the restaurant. When Jose re-entered the restaurant, Joy saw

_____

[3] We refer to the victim and his wife by their first names to avoid any confusion caused by their common last name. No disrespect is intended.

A-5288-17

defendant standing, facing the door to the restaurant. She described defendant at trial as a short, African American male, who was wearing a dark navy blue jacket with white lettering, which reminded her of a Yankees jacket.

A short time later, Jose walked out of the restaurant and then felt "someone's presence" behind him. Defendant then pointed a black, semi-automatic handgun at Jose's head, told him to walk slowly, and pushed him toward the darkest part of the parking lot.

While standing "face to face," Jose told defendant that he did not want any problems, explained that his family was nearby, and tried to push the gun away. Defendant asked Jose whether he "believe[d]" he "was serious," and then pulled the trigger and fired a shot towards Jose's feet. Jose was not sure whether defendant "was trying to shoot at [him] or whether [defendant] was frightened," but insisted that he "did shoot [the gun]."

Jose told defendant to "calm down," and placed his brown leather wallet, which he said contained $400 in cash, on the roof of a car. Defendant then told Jose to turn around. Jose turned toward the ground and bent over because he believed defendant was going to shoot him, but he then saw out of the corner of his eye that defendant was walking away.

A-5288-17

During the encounter, Joy heard Jose yell, "Please stop my wife's right over there." She also heard a "popping [noise] like firecrackers," which she assumed was a gun, and then saw defendant walk by the driver's side of her car. As defendant walked in front of her headlights, Joy saw him pull on a black ski mask, with openings for his eyes and mouth, over his head.

Shortly thereafter, Jose returned to the car, "yelling and crying," and told Joy "to chase after the guy." When Joy refused, Jose grabbed his phone out of the car and ran after defendant.

Joy called 911 and during her call, which was played for the jury, she told the dispatcher that her husband had been robbed in the parking lot of the restaurant, by a short, African American man, wearing a navy blue jacket with white lettering on it and blue jeans. She said she heard "one pop," and saw the man pull a black mask over his face as he walked in front of her car.

At the same time, Jose also called 911 while he chased after defendant. During his frantic 911 call, which also was played for the jury, Jose told the dispatcher defendant shot at him on Springfield Avenue near a different restaurant and took his wallet. Jose described defendant as a little, black male, wearing a hat and black jeans.

6

Jose testified that while he was on the phone with the dispatcher, he lost sight of defendant, but a worker at the other restaurant directed Jose's attention to a building located at 1207 Springfield Avenue. That building was adjacent to a daycare center, across the street from the other restaurant, and close to a cell phone store.

Jose then saw defendant, who was not wearing a ski mask, enter the small alleyway adjacent to that building through the open gate. He did not follow defendant into the alleyway, but instead remained by the entrance and waved down Officer Steve Jean-Simon, of the Irvington Police Department, who at 1:12 a.m. had responded to the report of an armed robbery. Jean-Simon testified that Jose was "very excited and very frantic," and said he had been robbed at gunpoint by "a short black male wearing a dark-colored jacket and . . . jeans," who ran "through the alleyway of 1207 Springfield Avenue."

Jean-Simon and another responding officer, Sergeant Charles Capers, searched the alleyway and backyard of 1207 Springfield Avenue, but did not find anyone. Jean-Simon described the alleyway as just wide enough for a small car to drive through, said the empty lot behind the building was strewn with "a lot of trash and broken bottles," and that the building was not occupied. He

A-5288-17

thought defendant may have climbed over the chain-link fence that lined the alleyway and escaped onto Stuyvesant Avenue.

Shortly thereafter, Officer Zhane Morgan, of the Irvington Police Department, received a call directing all units to the area of Stuyvesant and Lyons Avenues. The suspect was described as "[a] short black male, wearing a varsity jacket and blue jeans." As Morgan drove down Lyons Avenue toward Stuyvesant Avenue, she made eye contact with a man, whom she identified at trial as defendant, and who fit the dispatch description, except that he was wearing a red shirt, not a jacket. She saw defendant run and then hop over a fence into the rear yard of the house at the corner of Lyons and Stuyvesant Avenues.

Capers climbed over the fence and illuminated the area with his flashlight. Morgan saw defendant lying on the roof of a shed and yelled to Capers, who grabbed the man's foot and told him to get down. Capers described the man, who he identified at trial as defendant, as a short, black male, wearing a red shirt and jeans.

Capers testified that he decided to do a showup identification because less than thirty minutes had elapsed between the robbery and the discovery of the suspect on the roof. At Capers's direction, Jean-Simon, who had been searching

8

for shell casings in the restaurant's parking lot with Jose, brought Jose to a location near 665 Stuyvesant Avenue. Jean-Simons testified that he told Jose they had "someone detained," who "may or may not be the person involved in this robbery," and Jose had "no obligation to pick someone at this time." Jose testified at trial that the officer told him "we're going to see if we can recognize a person who is, like, a suspect."

Upon arrival, they saw Morgan and Capers standing in the driveway with defendant about one car length from the patrol car. When Jean-Simons shined his spotlight on defendant's face, Jose "immediately became hysterical, started crying," and said, "That's him. That's him. That's the guy that shot --." Jose testified that he identified defendant as the person who had robbed him, but admitted it was "a little bit confusing," because although he recognized defendant's face, defendant was wearing a red shirt, and not a jacket. Defendant was arrested and taken to police headquarters.

At approximately 2:54 a.m., Capers, Morgan, who was the department's evidence technician, and Sergeant Steven Salvatoriello, of the Essex County Sheriff's Office K-9 Unit, returned to 1207 Springfield Avenue to search for evidence. Capers testified at trial that the building looked abandoned, the rear door was unlocked, and that after they entered, they saw in plain view at the top

9                                                                                    A-5288-17

of the stairs, a black and white varsity-style jacket, a handgun, a mask, and a brown wallet. The handgun contained six .22 caliber hollow-point bullets. The wallet contained Jose's identification and $138 in cash. At trial, Joy and Jose identified the jacket as the one they saw defendant wearing, and Joy identified the mask as the one she saw defendant wearing.

Linnea Schiffner, the State's DNA expert, testified that DNA testing could not be performed on the jacket because the samples were not of high enough quality but defendant's DNA (as a major contributor) was found on the mask, along with the DNA of two other individuals, who were minor contributors.

On July 12, 2017, an Essex County grand jury indicted defendant for: first-degree robbery, in violation of N.J.S.A. 2C:15-1 (count one); second-degree unlawful possession of a weapon (handgun), in violation of N.J.S.A. 2C:39-5(b) (count two); possession of a firearm for an unlawful purpose, in violation of N.J.S.A. 2C:39-4(a) (count three); second-degree aggravated assault, in violation of N.J.S.A. 2C:12-1(b)(1) (count four); third-degree aggravated assault, in violation of N.J.S.A. 2C:12-1(b)(2) (count five); fourth-degree aggravated assault, in violation of N.J.S.A. 2C:12-1(b)(4) (count six); fourth-degree possession of hollow-nose bullets, in violation of N.J.S.A. 2C:39-3(f) (count seven); third-degree receiving stolen property (a handgun), in

A-5288-17

violation of N.J.S.A. 2C:20-7(a) (count eight); and third-degree theft by unlawful taking, in violation of N.J.S.A. 2C:20-3(a) (count nine).

On January 8, 2018, the trial judge denied defendant's pre-trial motion for a Wade/Henderson hearing that challenged the admissibility of Jose's out-of-court identification of defendant. At the conclusion of a pre-trial hearing on March 29, 2018, the judge also denied defendant's motion to suppress the physical evidence—the handgun, jacket, mask, cigarette lighter, and wallet—found during a warrantless search of 1207 Springfield Avenue that the State alleged was an abandoned property. The judge denied the motion to suppress, finding the State had proved by a preponderance of the evidence that the property was abandoned, and the officers had a right to enter the building to conduct the warrantless search.

Trial was conducted before a jury in April and May 2018. At the conclusion of the trial the jury found defendant guilty of second-degree robbery as a lesser included offense of count one, and disorderly persons theft as a lesser include offense of count nine.

At defendant's sentencing on June 11, 2018, the judge denied the State's motion for a discretionary extended term. The judge then sentenced defendant on count one to a term of ten years, subject to an eighty-five percent period of

11

parole ineligibility pursuant to NERA.  The theft conviction (count nine) merged into count one.  On June 13, 2018, the judge issued a judgment of conviction.  This appeal followed.

## II.

Defendant argues in Point I that the trial court erred in denying his motion to suppress the items found during the warrantless search of 1207 Springfield Avenue because the police lacked an objectively reasonable basis to believe that the building was abandoned.  We disagree.

## A.

At the suppression hearing, defense counsel, citing State v. Randolph, 228 N.J. 566, 581 (2017), argued that defendant had automatic standing to challenge the search of 1207 Springfield Avenue, which was not justified under an exception to the warrant requirement.  The State conceded defendant had automatic standing because he was charged with a possessory offense, but argued he had no reasonable expectation of privacy in the items he abandoned in the common hallway of an abandoned building.

Salvatoriello was the only witness at the hearing.  He testified that on April 16, 2017, he received a call from the Irvington Police Department to report to 1207 Springfield Avenue with a search dog.  Upon arrival, at approximately

2:20 a.m., Capers informed him that they had received a report that a suspect, later identified as defendant, fired a handgun during a robbery on a nearby street. The victim told the police that after he was robbed, he saw defendant enter the alleyway on the side of the building located at 1207 Springfield Avenue.

Capers told Salvatoriello that defendant was arrested a short time later, on Stuyvesant Avenue. At the time of his arrest, defendant was not wearing the jacket seen during the robbery and did not have a handgun, and thus Capers wanted Salvatoriello to search the courtyard behind 1207 Springfield Avenue where he believed defendant may have disposed of those items.

Salvatoriello testified that the area surrounding 1207 Springfield Avenue was commercial, and the building located at that address appeared to be an abandoned commercial building. The sign on the front of the building read "Tabernacle of Grace Apostolic Ministries," and listed the hours for church services and other church events. He noticed the metal pull down gate at the entry to the adjacent alleyway was rolled up.

Prior to conducting the search, Salvatoriello inspected the alleyway and rear yard of 1207 Springfield Avenue and determined it was not safe for a canine search because the "entire length was littered with broken glass." He testified there was no lighting in the alleyway, the asphalt was "chopped up," and "[t]here

was garbage and broken glass in the entire length of the alleyway." The rear fenced-in yard behind the building, which resembled a parking lot, was also "littered with broken glass" and "piles of debris." Salvatoriello assisted Capers in conducting a grid search of the yard and alleyway using flashlights, but they found nothing of evidential value.

The officers then walked the perimeter of the building and tried to open doors. The rear door to 1207 Springfield Avenue, which Salvatoriello described as a solid "metal commercial type exterior door," was unlocked. There was a lot of litter and debris in the area around the rear door, there were two broken chairs next to the door, and there was a camera to the upper right of the doorway.

Upon entering the building through the unlocked door, Salvatoriello saw what he described as a "commercial common stairwell." The interior of the building "appeared very rundown," the stairs were "well worn, [and] some were beat up," and there was a doorknob on the floor. To the left of the common hallway was a secured doorway with a metal "clamshell" covering -- the type of covering he said was placed on doors in "abandoned buildings."

Salvatoriello climbed the curved stairs to the second floor, immediately followed by Capers. Before he reached the top of the second-floor landing, he saw "in plain sight," a dark jacket, a handgun, a cigarette lighter, a mask or

14

hoodie, and a wallet (later identified as Jose's wallet).  He said that the second floor was "[d]irty," the wood looked "[b]eat up," and he did not see anything that would lead him to believe that anyone lived there.  The officers called the crime scene unit to photograph and collect the evidence.

Salvatoriello admitted that prior to entering the building he had not spoken with the owners of 1207 Springfield Avenue or searched property records to ascertain who owned the building.  However, later in preparation for the suppression hearing, he conducted a records search of deeds and tax records and discovered that the property was listed as a class four property (a commercial property), a bank had foreclosed on the property in 2017, purchased it at a Sheriff's sale and then sold it to a private third-party.

After considering the testimony, the judge denied the motion, finding that although defendant had standing to challenge the search, the State had proved by a preponderance of the evidence that the property was abandoned, and thus defendant had no expectation of privacy in the seized items.  The judge found it was "clear from the record that the property was abandoned" and that defendant had no connection to the property, which had been foreclosed.  The judge reasoned that if the church had been operating, the gate to the alleyway would

have been down to protect the area, and there would not have been so much glass and debris on the ground.

The judge also found Salvatoriello's testimony was credible, noting the officer's "demeanor seemed calm," he did not "try[] to deceive the [c]ourt," and he appeared to answer the questions "honestly." Based on that testimony, the judge found it was reasonable for the officers to search the alleyway, where it was reported that defendant was seen after the robbery, and it was a "simple estimate that the gun and the jacket were abandoned somewhere." It appeared to be almost "an afterthought" to check the back door and find it was open. "[T]he officer had an absolute right to go in a door that was unlocked," during the course of a normal search.

### B.

Our review of a grant or denial of a suppression motion is limited. State v. Robinson, 200 N.J. 1, 15 (2009). We "defer to the fact findings of the trial court, provided they are supported by substantial credible evidence in the record . . . ." State v. Shaw, 237 N.J. 588, 607 (2019). "Deference to those findings is particularly appropriate when the trial court has the 'opportunity to hear and see the witnesses and to have the feel of the case, which a reviewing court cannot enjoy.'" State v. Watts, 223 N.J. 503, 516 (2015) (quoting State v.

Elders, 192 N.J. 224, 244 (2007)). "A trial court's findings should be disturbed only if they are so clearly mistaken 'that the interests of justice demand intervention and correction.'" Elders, 192 N.J. at 244 (quoting State v. Johnson, 42 N.J. 146, 151 (1964)). "A trial court's legal conclusions, however, 'and the consequences that flow from established facts,' are reviewed de novo." State v. Ahmad, 246 N.J. 592, 609 (2021) (quoting State v. Hubbard, 222 N.J. 249, 263 (2015)).

"[T]he Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution guarantee '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . .'" Randolph, 228 N.J. at 581 (second alteration in original) (quoting U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7). Warrantless searches and seizures are presumptively unlawful. Shaw, 237 N.J. at 608. "To overcome the presumption, the State has the burden of demonstrating the search fell within a recognized exception to the warrant requirement." Ibid.

In addressing a constitutional challenge to a warrantless search and seizure, courts consider whether the defendant has standing to pursue the challenge, and if he has standing, whether the search or seizure was justified by an exception to the warrant requirement. Randolph, 228 N.J. at 581. "For

standing purposes, Article I, Paragraph 7 provides broader protection to the privacy rights of New Jersey citizens than the Fourth Amendment." State v. Brown, 216 N.J. 508, 528 (2014).

"Under New Jersey law, the State bears the burden of showing that defendant has no proprietary, possessory, or participatory interest in either the place searched or the property seized." Randolph, 228 N.J. at 582 (citing Brown, 216 N.J. at 528).[4] Significantly, a defendant charged with a possessory offense of the evidence seized, as in this case, has automatic standing to challenge a search or seizure, unless the State establishes an exception to that rule. Id. at 581, 585; State v. Lamb, 218 N.J. 300, 313 (2014); State v. Alston, 88 N.J. 211, 228 (1981). Courts "do not engage in a reasonable expectation of privacy analysis when a defendant has automatic standing to challenge a search," such an analysis is only applied "in determining whether a defendant has a protectible Fourth Amendment and Article I, Paragraph 7 right of privacy in a novel class of objects or category of places." Randolph, 228 N.J. at 583-84. See State v. Armstrong, 463 N.J. Super. 576, 592 (App. Div.) (explaining that "the two concepts — possessing a reasonable expectation of privacy and standing to

---

[4] In contrast, "[u]nder federal law, the defendant has the burden of showing that he had a reasonable expectation of privacy that was violated by the police." Ibid.

challenge a search and seizure — are not congruent"), certif. denied, 244 N.J. 242 (2020).

There are three exceptions to the automatic standing rule in searches of real property, that is, an accused will not have standing to challenge the search of: (1) an "abandoned property," (2) "property on which he was trespassing," or (3) "property from which he was lawfully evicted." Randolph, 228 N.J. at 585 (citing Brown, 216 N.J. at 527-29; State v. Hinton, 216 N.J. 211 (2013)). The State bears the burden of proving the exceptions by a preponderance of the evidence. Randolph, 228 N.J. at 585; Brown, 216 N.J. at 527-29.

"Ultimately, the focus must be whether, in light of the totality of the circumstances, a police officer had an objectively reasonable basis to conclude that a building was abandoned, or a defendant was a trespasser before the officer entered or searched the home." Brown, 216 N.J. at 535-36. "[A] police officer's sincere, good-faith but unreasonable belief that real property is abandoned will not justify a warrantless search when a defendant has an apparent possessory interest in that property." Id. at 531.

In Brown, the Court identified several factors to be considered, in light of the totality of the circumstances, in determining whether a building was abandoned. Id. at 532. In assessing whether an officer acted in an objectively

19

reasonable manner, courts should consider whether the officer conducted a records check of deeds, tax records, or utility records to identify the owner of the property; the condition of the property; whether the owner or lessee has taken measures to secure the building from intruders; and "an officer's personal knowledge of a particular building and the surrounding area." Id. at 533-34. "No one factor is necessarily dispositive, and the weight to be given to any factor will depend on the particular circumstances confronting the officer." Id. at 532.

However, the Court in Brown cautioned that there is no "trashy house exception" to the warrant requirement. Id. at 534. Thus, and even "dilapidated housing, with interiors in disarray and in deplorable condition," may not be abandoned. Ibid. The Court explained that

> a police officer may be familiar with an unoccupied building with missing doors and broken windows, and an interior in utter shambles and lacking electricity, and reasonably conclude that the structure is abandoned. The decrepit condition of the exterior and interior of a building is a factor, but other circumstances will necessarily come into play. For example, the boarding of windows and bolting of doors of a shabby-looking building will suggest an intent to keep people out by a person exercising control over the property and therefore may be evidence that conflicts with abandonment.
>
> [Ibid.]

Applying that analysis, the <u>Brown</u> Court upheld the trial court's suppression of gun and drug evidence seized through the warrantless search of a dilapidated row house that the police apparently believed was abandoned.  <u>Id.</u> at 537-42.  Over the course of two non-consecutive days, the officers had conducted several hours of surveillance during daylight hours, and observed the defendants use a key to unlock the padlocked front door of the house to enter and retrieve a small item, presumably drugs, and hand it to a presumed buyer.  <u>Id.</u> at 538-39.  The house was in a "deplorable condition," in that there were broken windows, it was littered with trash bags filled with old clothes and soda cans, and other items, and had a missing electric meter.  <u>Id.</u> at 540.

However, both the front and back doors to the house were secured to keep intruders out; the front door was padlocked and the back door, although off its hinges, was propped shut from the inside.  <u>Id.</u> at 540.  Further, there was no reliable or first-hand testimony regarding the long-term condition of the house, nor any reasonable attempt by law enforcement to contact the owner or conduct a records check, which the Court found, would not have "been difficult or unduly cumbersome."  <u>Id.</u> 540-42.  Based on that evidence, the Court determined the trial court's finding that the house was not abandoned for standing purposes was supported by the record.  <u>Id.</u> at 542.  The Court held that "[t]he question to be

21

answered is not whether the police have a subjective, good-faith belief that a building is abandoned, but whether they have an objectively reasonable basis to believe so." Ibid.

The Court in Randolph, 228 N.J. at 588, applying the principles in Brown, affirmed our decision that the defendant in that case had automatic standing to challenge the search of the apartment because the State failed to show it was abandoned or the defendant was a trespasser. In that case, the outside door to the three-story apartment building was locked and the officer was let in by a first-floor tenant. Ibid. The door to the second-floor apartment had been left ajar and before entering, the officer saw a couch and debris. Id. at 588-89. After entering, the officer saw "another couch, Timberland boots, a pair of Nike sneakers, a backpack, a television and video gaming system, and clothes draped on a couch and strewn on the floor along with a cigarette pack, a soda bottle, and mail [addressed to the defendant]." Id. at 589.

The Court in Randolph held "that, in light of the totality of the circumstances, the police did not have an objectively reasonable basis to believe that the second-floor apartment was abandoned." Ibid. During the surveillance, the police observed an individual peering out the window of the second-floor apartment, indicating the individual was either a resident or had been invited

onto the premises.  Id. at 588.  Further, the "locked outside door was evidence that the building's residents intended to keep the public from entering even the common areas without invitation."  Ibid.  The Court found:

> Regardless of the disarray in the apartment and the fact that it was not fully furnished, there were clear signs that someone occupied it.  The police did not contact the landlord to determine whether the second-floor apartment had been leased, and nothing in the record indicates that the first-floor resident was asked about the status or possible occupants of the upstairs apartment.  Nothing in the record suggests that defendant was not an invitee in the apartment, and indeed the State argued at trial that the mail addressed to defendant found inside the apartment was evidence of his presence in the apartment.
>
> [Id. at 589.]

The Court in Randolph also set forth that:

> Importantly, at the suppression hearing, the prosecutor did not argue that defendant lacked standing to challenge the search on the basis that the apartment was abandoned.  Instead, the prosecutor contended that the police conducted a lawful search pursuant to the exigent-circumstances and protective-sweep exceptions to the warrant requirement.  The trial court never addressed the substantive grounds on which the prosecutor attempted to justify the search.  The trial court, moreover, did not apply our well-established principles governing standing.  Rather, the court turned to the reasonable expectation of privacy test, typically used in federal courts, and then came to a conclusion—not supported by the evidence—that the apartment was vacant.

23

[<u>Ibid.</u>]

The Court concluded that the trial court erred in its analysis and remanded for a new suppression hearing, at which "the State and defendant should be afforded the opportunity to present evidence concerning the prosecutor's claimed justification for the warrantless entry and search." <u>Id.</u> at 590.

Here too, based on the possessory weapons charges, the central issue was whether defendant had automatic standing to challenge the warrantless search of 1207 Springfield Avenue. Defendant did not have standing if the building was abandoned, or if he was a trespasser, because under those circumstances he would not "have the requisite possessory or proprietary interest in the property to object to the search." <u>Brown</u>, 216 N.J. at 529.

Applying the factors set forth in <u>Brown</u>, we conclude there was credible evidence to support the trial judge's finding that based on the totality of the circumstances the building was abandoned. That finding deprived defendant of any standing to challenge the search.

First, unlike <u>Brown</u>, the officers had not conducted a surveillance of the building and had not seen anyone enter the building by using a key to open a locked door. Instead, the officers searched an alleyway, late at night, shortly after the reported armed robbery, where they suspected defendant had

abandoned the handgun. As the trial judge found, the officers checked the backdoor to the building "almost as an afterthought," because they had not located the handgun in the alleyway. An examination of the records on ownership of the building at that late hour and given the need to quickly find an abandoned loaded handgun would have been both difficult and unduly cumbersome under these circumstances.

Second, the condition of the property and the failure to secure the premises supported a finding of abandonment. Brown, 216 N.J. at 532. While searching the alleyway the officers noticed that the owner of the property had not taken measures to secure the building from intruders because the gate to the alley was open and the backdoor was unlocked. Additionally, the officers had personal knowledge that the building was in a commercial, not residential area, and their determination that the building was an abandoned commercial building was consistent with the building's appearance. There was no furniture, clothes, shoes, blankets, food, or any other items in the building to indicate that anyone, much less defendant, resided there or had any possessory interest in the premises. The alleyway and backyard were filled with so much broken glass and debris that it was not safe for a search dog, and thus, reasonably would also not have been safe for residents. Those factors, the condition of the property,

25

and the officers' knowledge of the commercial nature of the area, support a finding that the officers had an objectively reasonable basis to conclude that the building was abandoned before they entered it or searched it.

Under the totality of the circumstances, we conclude the trial judge's finding that the property was abandoned was supported by the substantial credible evidence in the record. Shaw, 237 N.J. at 607. Because the building was abandoned, defendant did not have automatic standing to challenge the warrantless search and seizure. Therefore, the officers did not violate his constitutional rights when they entered and searched the abandoned building, and seized the items defendant left there, without a warrant.

III.

Defendant argues in his Point II that the trial judge erred in denying his motion to suppress Jose's out-of-court identification or, alternatively, in denying his application for a Wade/Henderson hearing because there was no audio, video, or written verbatim account of the showup identification procedure, and based on the limited record, the procedure was impermissibly suggestive. We conclude the trial judge erred in not conducting a Wade/Henderson hearing on the admissibility of the out-of-court identification. For that reason, we remand the matter for the required hearing.

It was undisputed that no audio or video recordings were made of the showup, nor was a contemporaneous written record prepared. Instead, approximately three hours after the showup, at 4:43 a.m., Jean-Simone completed a written "Showup Identification Procedures Worksheet," documenting Jose's identification of defendant.

In the worksheet, the officer set forth the time and place where the identification was conducted and the identities of the officers; checked the box indicating he had instructed Jose that the actual perpetrator may or may not be in the showup and he should not feel compelled to make an identification; and, set forth that Jose "became extremely emotional" when he saw defendant and said, "[T]hat's him, that's the guy who tried to kill me." In the incident report, prepared on that same date, Jean-Simon similarly wrote, "After placing the spotlight on [defendant's] face and asking [Jose] if he recognized [defendant], he became extremely emotional and stated[,] 'That's him that's the guy who tried to kill me.'"

Defendant filed a pretrial motion for a Wade/Henderson hearing to determine the admissibility of Jose's out-of-court identification. He argued the identification procedure was impermissibly suggestive due to system variables

27

(the inherently suggestive showup procedure conducted based on an anonymous source), and the officer's failure to adequately record the procedure, including any pre-identification instructions, violated Rule 3:11 and State v. Delgado, 188 N.J. 48 (2006). In support of the motion, defendant submitted the incident report, an audio recording of Jose's testimony before the grand jury, and an audio recording of Jose's statement. In her brief, defense counsel stated that she had not received "any showup identification worksheet or report further documenting communications between officers and [Jose] during the procedure," and the incident report was the only record of the procedure.

The State opposed the motion and argued defendant had failed to meet his burden of presenting some evidence of suggestiveness in a system variable, and even if a hearing were granted, the motion to suppress should be denied because "there [was] overwhelming indicia of reliability." The prosecutor did not submit the worksheet to the trial judge but cited to Jose's grand jury testimony in which Jose said he was "confident" in his identification, and the officer told him the person they detained may or may not have committed the offense and he was not compelled to make a selection.

The trial judge denied the motion for a Wade/Henderson hearing and found that although "there are various elements of State v. Henderson, which

may be argued to the [j]ury," it was clear from the testimony presented to the grand jury and other submissions that it had "not risen to the level that a hearing is required." There was a "very short period of time," about fifteen minutes, between the incident and the identification. Although Jose was nervous and under stress during the robbery, he was "clear and sure about the identification" during his grand jury testimony. The judge did not address defendant's argument that the officers violated Rule 3:11 and Delgado by failing to record the identification procedure. The judge also made no reference to the worksheet that, again, was not provided by the prosecutor.

B.

Our "standard of review on a motion to bar an out-of-court-identification . . . is no different from . . . [a] review of a trial court's findings in any non-jury case." State v. Wright, 444 N.J. Super. 347, 356 (App. Div. 2016) (citing Johnson, 42 N.J. at 161). "The aim of the review at the outset is . . . to determine whether the findings made could reasonably have been reached on sufficient credible evidence present in the record." Ibid. (alteration in original) (quoting Johnson, 42 N.J. at 162). In our review, we will defer to the trial court's findings even when they are based solely on its review of documentary or video evidence. State v. S.S., 229 N.J. 360, 381 (2017). Our "review of the trial court's

29

application of the law to the facts, however, is plenary." <u>Wright</u>, 444 N.J. Super. at 357.

A trial court may hold a <u>Wade/Henderson</u> hearing to determine whether a pretrial eyewitness identification of a criminal defendant was properly conducted and thus admissible under N.J.R.E. 803(a)(3). A hearing is not, however, required in every case in which the State seeks to introduce such evidence. The requirements for determining whether a defendant is entitled to an evidentiary hearing are set forth in <u>Henderson</u>, 208 N.J. at 208 and <u>State v. Anthony</u>, 237 N.J. 213 (2019). Also relevant are <u>Delgado</u>, 188 N.J. at 48 and the provisions of <u>Rule</u> 3:11.

In <u>Henderson</u>, 208 N.J. at 287, the Court revised the <u>Manson/Madison</u>[5] legal framework for evaluating eyewitness identification evidence, and reaffirmed its ruling in <u>Delgado</u>, 188 N.J. at 63, that identifications conducted by law enforcement officers must be recorded and preserved. Under the revised framework, in order to obtain a hearing, "a defendant has the initial burden of showing some evidence of suggestiveness that could lead to a mistaken identification," tied to a "system variable." <u>Henderson</u>, 208 N.J. at 288-89.

---

[5] <u>Manson v. Brathwaite</u>, 432 U.S. 98, 114 (1977), <u>State v. Madison</u>, 109 N.J. 223, 242 (1988).

"System variables" are "variables within the State's control," and include pre-identification instructions and showups.  Id. at 248, 250, 259-61.  If a defendant makes a threshold showing for a hearing, the burden shifts to the State to "offer proof to show that the proffered eyewitness identification is reliable—accounting for system and estimator variables . . . ."  Id. at 289.  "[E]stimator variables are factors beyond the control of the criminal justice system," and "can include factors related to the incident, the witness, or the perpetrator."  Id. at 261.

At the hearing, however, "the ultimate burden remains on the defendant to prove a very substantial likelihood of irreparable misidentification."  Id. at 289.  "[T]he court can end the hearing at any time if it finds from the testimony that defendant's threshold allegation of suggestiveness is groundless."  Ibid.  Last, "if after weighing the evidence presented a court finds from the totality of the circumstances that defendant has demonstrated a very substantial likelihood of irreparable misidentification, the court should suppress the identification evidence."  Ibid.

Rule 3:11, Record of an Out-Of-Court Identification Procedure, was adopted effective September 2012, in response to Henderson and Delgado.  Pressler & Verniero, Current N.J. Court Rules, cmt. 1 on R. 3:11 (2022).  As

31

initially adopted, and in effect at the time of this case, <u>Rule</u> 3:11(b), Method of

Recording,[6] then provided:

> A law enforcement officer shall contemporaneously
> record the identification procedure in writing, or, if
> feasible, electronically. If a contemporaneous record
> cannot be made, the officer shall prepare a record of the
> identification procedure as soon as practicable and
> without undue delay. Whenever a written record is
> prepared, it shall include, if feasible, a verbatim
> account of any exchange between the law enforcement
> officer involved in the identification procedure and the
> witness. When a written verbatim account cannot be
> made, a detailed summary of the identification should
> be prepared.

---

[6] <u>Rule</u> 3:11, was amended effective June 8, 2020, two and a half years after the judge's decision in this case. Of particular note, subsection (b) now provides:

> A law enforcement officer shall electronically record
> the out-of-court identification procedure in video or
> audio format, preferably in an audio-visual format. If
> it is not feasible to make an electronic recording, a law
> enforcement officer shall contemporaneously record
> the identification procedure in writing and include a
> verbatim account of all relevant verbal and non-verbal
> exchanges between the officer and the witness; in such
> instances, the officer shall explain in writing why an
> electronic recording was not feasible. If it is not
> feasible to prepare a contemporaneous, verbatim
> written record, the officer shall prepare a detailed
> written summary of the identification procedure as soon
> as practicable and without undue delay, and explain in
> writing why an electronic recording and a
> contemporaneous, verbatim written account were not
> feasible.

Rule 3:11(c), also adopted at the same time, specified that the record should include, notably, the dialogue between the witness and officer who administered the procedure, and a witness' statement of confidence, in his own words, of the identification. Finally, Rule 3:11(d), provides:

> If the record that is prepared is lacking in important details as to what occurred at the out-of-court identification procedure, and if it was feasible to obtain and preserve those details, the court may, in its sound discretion and consistent with appropriate case law, declare the identification inadmissible, redact portions of the identification testimony, and/or fashion an appropriate jury charge to be used in evaluating the reliability of the identification.

In October 2012, the Attorney General issued the model showup worksheet at issue here.[7] The worksheet was "designed to assist law enforcement officers in documenting the procedures/results of showups," and to "serve as a checklist to ensure that officers comply with all of the requirements for eyewitness identification procedures established by Court Rule and New Jersey Supreme Court case law." Showup Worksheet at 3. The worksheets are required to be "prepared during the procedure, or immediately thereafter." Ibid. Officers were instructed that showups could not be conducted if more than two

---

[7] Showup Identification Procedures Worksheet, N.J. Div. of Crim. Just. (rev. Oct. 1, 2012), https://www.nj.gov/oag/dcj/agguide/Eye-ID-Showup.pdf [hereinafter Showup Worksheet].

hours had elapsed from the time of the incident, they were not to provide any feedback to the eyewitnesses, and they were required to make a statement regarding the eyewitness's level of confidence that the suspect was the perpetrator. Ibid.

In March 2019, a year after the trial judge's decision in this case, the Court in Anthony, 237 N.J. at 233, modified the Henderson framework, and held that "a defendant will be entitled to a pretrial hearing on the admissibility of identification evidence if Delgado and Rule 3:11 are not followed and no electronic or contemporaneous, verbatim written recording of the identification procedure is prepared." Ibid. Under those circumstances, a defendant "will not need to offer proof of suggestive behavior tied to a system variable" to be entitled to a Wade/Henderson hearing. Id. at 233-34. The Court stated "[t]his approach supplements the other remedies listed in Rule 3:11(d)." Id. at 234.

In Anthony, the Court found the officers had not complied "with Rule 3:11 or Delgado in full" because they had not prepared an electronic recording of the witness's out-of-court identification of the defendant, or a contemporaneous, verbatim written account of the exchange between the witness and the officer who administered the photo array. Id. at 235. Further, the State's reliance on a three-page police department form to document the identification process did

not create an adequate record, because without an electronic recording or contemporaneous written account of the exchange, the record did not reveal the full dialogue between the witness and the officer, Rule 3:11(c)(2), nor was the witness's statement of confidence reflected in his own words, Rule 3:11(c)(9). Id. at 236. The Court remanded the case for a Wade/Henderson hearing, even though defendant had not presented evidence of suggestiveness, to allow defendant to explore all relevant variables. Id. at 238.

Here, defendant argues on appeal that the officer failed to comply with Rule 3:11 and Delgado, and thus, as clarified by Anthony, the trial judge should have suppressed the identification evidence, or at a minimum, granted his request for a Wade/Henderson hearing. We agree that a hearing was required.

The governing law at the time of the court's ruling in 2018, as to the contents of the record of an out-of-court identification procedure, was set forth in Delgado, 188 N.J. at 48 and Rule 3:11. In Delgado, 188 N.J. at 63, the Court invoked its supervisory powers under Article VI, Section 2, Paragraph 3 of the New Jersey Constitution to require "that, as a condition to the admissibility of an out-of-court identification, law enforcement officers make a written record detailing the out-of-court identification procedure, including the place where the procedure was conducted, the dialogue between the witness and the interlocutor,

and the results." Ibid. "When feasible, a verbatim account of any exchange between the law enforcement officer and witness should be reduced to writing. When not feasible, a detailed summary of the identification should be prepared." Ibid. At that time, electronic recordation was advisable, but not mandated. Ibid.

Here, the officer filled out the worksheet, a form that is still in use today, which was designed to comply with Rule 3:11 and Delgado. The officer documented the time and place where the procedure was conducted, and the exact words that Jose used when identifying defendant. However, as in Anthony, the officer did not comply with Rule 3:11 or Delgado in full because he did not record the identification or prepare a contemporaneous written account. Anthony, 237 N.J. at 235. And reliance on the worksheet, which was apparently not submitted to the trial court during the suppression motion, "did not create an adequate record in other respects." Id. at 236. The worksheet did not contain a verbatim account or a detailed summary of the dialogue between the officer and Jose as required under Rule 3:11(c)(2). The officer simply checked the box indicating he instructed Jose that the actual perpetrator may or may not be in the showup, while Jose testified he was told before the identification the police had a suspect.

36

There is no per se rule barring identification evidence for failure to strictly comply with Rule 3:11. State v. Green, 239 N.J. 88, 109 (2019); Anthony, 237 N.J. at 239; Henderson, 208 N.J. at 303. Instead, "[w]hen the record of an identification 'is lacking in important details,' and it was feasible to preserve them, Rule 3:11(d) affords a judge discretion, consistent with appropriate case law, to bar the evidence, redact part of it, and/or 'fashion an appropriate jury charge' if the evidence is admitted." Green, 239 N.J. at 109. "Indeed, suppression should be the remedy of last resort, and judges should explain why other remedies in Rule 3:11(d) are not adequate before barring identification evidence." Ibid.

Applying these guiding principles, we conclude defendant is entitled to a Wade/Henderson hearing because the officer failed to fully comply with Rule 3:11 and Delgado by making a contemporaneous record. Although Anthony was decided after the trial judge's decision in this case, notably the Court in Anthony, unlike Henderson, did not set forth that its ruling had prospective application only. Further, under the revised threshold standard adopted in Anthony, in State v. Guerino, 464 N.J. Super. 589, 611 (App. Div. 2020), we applied the ruling retroactively and remanded for the trial court to convene an evidentiary hearing on the admissibility of a photo array identification procedure conducted in 2016

37

because the report did not provide a detailed account of the dialogue between the officer and the witness. Ibid. Similarly, here, under the revised threshold, defendant was entitled to a Wade/Henderson hearing without having to prove suggestiveness. Anthony, 237 N.J. at 233-34.

Moreover, under the pre-Anthony/Henderson framework, defendant made the threshold showing for a Wade/Henderson hearing based on "the inherent suggestibility of a showup . . . ." Wright, 444 N.J. Super. at 357. It is well established that "one-on-one showups are inherently suggestive . . . . because the victim can only choose from one person, and, generally, that person is in police custody." State v. Herrera, 187 N.J. 493, 504 (2006). In Herrera, a pre-Henderson case, the Court held "that standing alone a showup is not so impermissibly suggestive to warrant proceeding to the second step." Ibid. "Our law has permitted 'on or near-the-scene identifications because they are likely to be accurate, taking place . . . before memory has faded and because they facilitate and enhance fast and effective police action and they tend to avoid or minimize inconvenience and embarrassment to the innocent.'" State v. Jones, 224 N.J. 70, 87 (2016) (alteration in original) (quoting Herrera, 187 N.J. at 504). "[H]owever, only a little more is required in a showup to tip the scale toward impermissibly suggestive." Herrera, 187 N.J. at 504.

Here, even though, as the trial judge found, the showup was conducted within fifteen to thirty minutes of the incident, the record is incomplete as to the pre-identification dialogue between Jean-Simon and Jose, a requirement under Rule 3:11 and Delgado. It appears that the trial judge did not have a copy of the worksheet at the time of the motion and thus there was no record of any pre-identification instructions. Further, even if the judge had the worksheet, and although the officer checked the box indicating he instructed Jose that the actual perpetrator may or may not be in the showup, Jose testified at trial that the officer told him "we're going to see if we can recognize a person who is, like, a suspect." See Jones, 224 N.J. at 87 (noting statements by police identifying witness as a suspect can bear on suggestiveness of a showup).

The Wade/Henderson hearing requested by defendant would have provided him with "the opportunity to attempt to secure the information denied to him by the Delgado violation," namely, the full dialogue between Jean-Simon and Jose, before, during, and after the identification, including whether the officer referred to defendant as a "suspect." State v. L.H., 239 N.J. 22, 54 (2019). As a result, we remand the matter for an evidentiary hearing to allow defendant the opportunity to explore the issue of suggestiveness in the showup process and for the appropriate remedy for the Delgado violation.

By way of guidance, the trial judge on remand may in her discretion end the hearing if she finds that the showup worksheet recounted verbatim the entire exchange between the officer and Jose, provided no evidence of suggestiveness has been demonstrated by the evidence. Guerino, 464 N.J. Super. at 612. If the trial judge finds the evidence should not have been admitted, or alternatively only admitted with redactions or cautionary instructions, the parties can then present argument as to whether a new trial is warranted. Henderson, 208 N.J. at 300. However, if the evidence presented does not show that any violations of Rule 3:11 and the out-of-court identification was reliable, then defendant's conviction and sentence shall stand. See Anthony, 237 N.J. at 238.

IV.

We reach a different conclusion as to defendant's argument in Point III that contends the trial judge erred in admitting Joy's first-time identification of defendant at trial because it was "highly suggestive and unreliable." He argues her in-court identification should have been stricken under the principles established in Henderson, and in the alternative, even if Henderson did not apply, "a straightforward application of N.J.R.E. 401 and 403 compelled the exclusion of Joy's in-court identification." We disagree.

40

## A.

Prior to trial, defense counsel moved to preclude Joy from making an in-court identification because the officers failed to conduct an out-of-court identification procedure. There is no indication in the record that the trial judge addressed this application.

During Joy's testimony at trial, she identified defendant, unprompted, for the first time on direct, as someone she saw in the parking lot of the restaurant where they had gone to pick up dinner. At side bar, defense counsel moved to strike Joy's identification because counsel believed the prosecutor had agreed not to elicit this testimony, it was "highly suggestive" for a person to make a first-time in-court identification, and there was out-of-state case law to support the exclusion of the identification. The prosecutor countered that he had not prompted Joy to identify defendant, and, in any event, first-time in-court identifications were "completely proper." The prosecutor argued that defense counsel could cross-examine her on the identification and that the jury should be given a Henderson in-court identification charge.

The trial judge found that the prosecutor had not solicited the in-court identification, denied the application to strike, and agreed to include the in-court identification instruction in the final charge. The judge then instructed the jury,

41

"you will note . . . [ that Joy] made an in-court identification. . . . that is the first identification she has made.  There will be a charge that is given to you at the end of the case about in-court identifications."

Thereafter, defense counsel objected to Joy's testimony that she was "certain" of her identification of defendant.  The court overruled the objection finding that defense counsel could address her answer on cross-examination.  Joy subsequently testified that she had not previously identified defendant, she was "very certain" that defendant was the man she saw in the parking lot, and she described the circumstances surrounding her out-of-court observation of defendant.

In her final charge, the judge instructed the jury, without objection, substantially in accord with the Model Jury Charges (Criminal), "Identification: In-Court and Out-Of-Court Identifications" (rev. May 18, 2020), including that the jury could consider "whether the witness did not identify the defendant at a prior identification procedure."

### B.

"[T]he decision to prohibit an in-court identification is made on a case-by-case basis."  Guerino, 464 N.J. Super. at 606.  In our review of these determinations, we "defer to a trial court's evidentiary ruling absent an abuse of

discretion." State v. Garcia, 245 N.J. 412, 430 (2021). "[A]pellate review," nonetheless, "remains a backstop to correct errors that may not be caught at or before trial." Guerino, 464 N.J. Super. at 620.

In determining the reliability of an in-court identification, the Court in Madison, 109 N.J. at 243, adopted the factors set forth in Manson, 432 U.S. at 114. Those factors include the "opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation and the time between the crime and the confrontation.[8]" Id. at 239-40 (quoting Manson, 432 U.S. at 114).

Significantly, in Guerino, we recently rejected a defendant's contention that the court should "ban all in-court identifications, or at least to restrict in-court identifications to cases where there has been an 'unequivocal' out-of-court identification." 464 N.J. Super. at 605. In that case, the eyewitness said she was eighty percent confident in her out-of-court identification of the defendant from a photo array, but after seeing defendant at trial, testified that she was one

---

[8] Thereafter, the Court in Henderson, 208 N.J. at 287, revised the Manson/Madison framework for evaluating out-of-court eyewitness identification evidence in view of scientific evidence, but did not eliminate or address in-court identification evidence.

hundred percent certain of her in-court identification. Id. at 602. The defendant argued, as in this case, that "the scientific principles that necessitated the reforms achieved in Henderson demonstrate that in-court identifications are the product of inherently suggestive circumstances and have minimal probative value." Id. at 605. Further, as in this case, the defendant maintained that "nearly all the system variables discussed in Henderson apply to in-court identifications, and that this traditional practice 'does not comport with the post-Henderson legal landscape and must be updated.'" Id. at 605-06.

We rejected that argument, stating that "[t]he relief defendant seeks would represent a significant change to our State's eyewitness identification jurisprudence," which is contrary to the "well-established precedent, including Henderson." Id. at 606.

We further explained:

> We do not mean to suggest the familiar practice of having a trial witness point to the defendant sitting at counsel table is a talisman carved in stone. Chief Justice Rabner aptly recognized in Henderson that scientific research on human memory and the reliability of eyewitness identifications will continue to evolve. [208 N.J.] at 219. We are not persuaded, however, that we have the evidential foundation upon which to grant the fundamental change defendant seeks. In Henderson, the reform of New Jersey's eyewitness identification jurisprudence was supported by an extensive report of a special master appointed by the

44

Court to compile and evaluate the scientific evidence regarding eyewitness identifications. Id. at 228-29. Using that example of scientific groundwork as a benchmark, the record before us in this case is inadequate to test the validity and utility of in-court identifications.

[Id. at 606-07.]

In any event, we concluded this was not "an appropriate case in which to decide whether to abandon an established practice" given its decision to remand for an evidentiary hearing. Id. at 607. "That hearing will examine whether the victim's in-court identification was tainted by either or both the photo array and hallway identification procedures. Defendant may yet obtain the ultimate remedy he seeks by applying existing legal principles. In these circumstances, we see no need to displace those principles." Ibid.

On appeal, defendant here raises identical arguments as to the application of the principles in Henderson to first-time in-court identifications and argues that they are the functional equivalent of a showup and thus Joy's in-court identification almost two years after the event could not produce a reliable identification and deprived defendant of a fair trial. We disagree.

Although not cited by the parties, our Supreme Court held that a first-time in-court identification was admissible in State v. Clausell, 121 N.J. 298, 327 (1990). In that case the witness identified one of the assailants for the first time

45

at trial, even though she had been unable to identify him out-of-court in an earlier photographic array. Ibid. The Court held that the in-court identification, which took place nineteen months after the incident, was properly admitted. Id. at 328. The Court found:

> Notwithstanding that [the witness] identified defendant for the first time in court, her identification was constitutionally valid. See United States v. Domina, 784 F.2d 1361, 1368 (9th Cir. 1986) (observing that no decision of the Supreme Court requires in-court identifications to meet the same standards of reliability as pretrial identifications), cert. denied, 479 U.S. 1038 (1987). Although undercut by the long delay between the crime and the trial, the reliability of the identification is supported by other considerations. . . . [The witness] had ample opportunity to view the assailants under circumstances in which she was seeking to establish their identities. The courtroom atmosphere was suggestive, but not so much so as to outweigh the reliability of the identification. Defense counsel had ample chance to challenge the accuracy of the identification on cross-examination, and the jury was free to discount its value based on [the witnesses'] inability to identify anyone on earlier occasions. See Domina, 784 F.2d at 1368 (noting that one advantage of in-court identification over pretrial identification is that jury can observe [the] witness during identification process).
>
> [Id. at 327-28.]

Thus, first-time in-court identifications are admissible under Clausell and were not revised or eliminated under Henderson, which only addressed

46

suggestive pre-trial identifications. We, as members of an intermediate appellate court, are "bound to comply with the law established by the Supreme Court." State v. Steffanelli, 133 N.J. Super. 512, 514 (App. Div. 1975).

We are not persuaded otherwise by defendant's reliance on the out-of-state opinion in Commonwealth v. Crayton, 21 N.E.3d 157 (Mass. 2014). At the outset, we observe that the opinion is not binding on us and has, in fact, been rejected by several courts. In Crayton, the Massachusetts Supreme Court overturned its precedent and held that "[w]here an eyewitness has not participated before trial in an identification procedure, we shall treat the in-court identification as an in-court showup, and shall admit it in evidence only where there is 'good reason' for its admission." Id. at 169. The court placed "the burden on the prosecutor to move in limine to admit the in-court identification of the defendant by a witness where there has been no out-of-court identification." Id. at 171. However, in State v. Doolin, 942 N.W.2d 500, 515 (Iowa 2020), the Iowa Supreme Court described Crayton as an "outlier." See also Garner v. People, 436 P.3d 1107, 1118-19 (Colo. 2019) (declining to adopt Crayton because it turned on state common law principles of fairness and departed from the standard articulated in Perry v. New Hampshire, 565 U.S. 228, 246 (2012)).

Furthermore, despite some similarities between showups and in-court identifications, the exclusionary pre-trial principles announced in Henderson should not apply with equal force to in-court identifications because, as set forth in Clausell, there are significant safeguards built into our adversary system to protect against a mistaken identification made for the first time at trial. Perry, 565 U.S. at 246. Such safeguards include the Sixth Amendment right to confront witnesses, the right to the effective assistance of counsel "who can expose the flaws in the eyewitness' testimony during cross-examination and focus the jury's attention on the fallibility of such testimony during opening and closing arguments," and eyewitness specific jury instructions. Ibid.

Those safeguards were at work during this trial. Defense counsel cross-examined Joy on the reliability of her spontaneous identification of defendant and argued in summation that her identification was not credible because it was based on feedback from her husband and her observation of him sitting at counsel table. Defense counsel also argued that Joy was not paying close attention to defendant when he walked around the parking lot because she was distracted by her phone, music, and her children, and was under stress and could not describe the face of the man who pulled a mask over his face as he ran in front of her car. The trial judge also gave the jury the lengthy model criminal

jury charge on in-court identification, and the jury was free to discount the identification. Additionally, as in <u>Clausell</u>, the reliability of Joy's in-court identification was supported by other considerations, including the conditions under which she observed him and the fact that her independent description of defendant at the scene was identical to Jose's description of the man who robbed him.

Last, defendant did not raise at trial, as he does now, the argument that Joy's in-court identification should have been excluded under N.J.R.E. 403. For that reason, we review the new contention for plain error. Under the plain error standard, we disregard "[a]ny error or omission" by the trial judge "unless it is of such a nature as to have been clearly capable of producing an unjust result . . . ." <u>R.</u> 2:10-2. To warrant reversal, "[i]n the context of a jury trial, the possibility must be 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" <u>State v. G.E.P.</u>, 243 N.J. 362, 389-90 (2020) (quoting <u>State v. Jordan</u>, 147 N.J. 409, 422 (1997)).

Under that standard, we conclude that even if the judge had erred in admitting Joy's identification, it was not plain error. Joy did not identify defendant as the robber, rather she identified him as the man she saw in the parking lot. Although Joy's testimony was corroborative, there was other strong

evidence as to defendant's identity as the robber, notably, the descriptions provided by both Jose and Joy at the scene, the fact that defendant's DNA was found on the mask next to Jose's wallet, and the officer's testimony as to their apprehension of defendant near the alleyway where he had been seen running after the robbery. Additionally, the jury was able to assess Joy's credibility in making the identification and was specifically instructed on the factors they should consider in making that assessment.

We have no cause to disturb defendant's conviction based upon Joy's identifying defendant for the first time at trial.

## V.

We last address defendant's argument in Point IV that the judge erred in imposing an excessive sentence. He contends that the judge erred in imposing a ten-year sentence, in considering his prior arrests, and in giving significant weight to the psychological effect of the incident on the victim's family. We find no merit to these contentions.

## A.

At sentencing , the judge first denied the State's application to sentence defendant to a discretionary extended term as a persistent offender under N.J.S.A. 2C:44-3(a), on the second-degree robbery count. The judge then found

aggravating factors three (the risk that defendant will commit another offense), six (the extent of defendant's prior record and the seriousness of the offenses), and nine (the need to deter), N.J.S.A. 2C:44-1(a)(3), (6), (9), and no mitigating factors under N.J.S.A. 2C:44-1(b).[9]

The presentence report considered by the judge in support of her findings revealed defendant's extensive criminal record. Defendant had two juvenile adjudications, and five adult indictable convictions for third-degree eluding, second-degree aggravated assault, second-degree possession of a weapon for an unlawful purpose, third-degree possession of a controlled dangerous substance (CDS), and fourth-degree resisting arrest. He received a five-year term for his conviction for aggravated assault and unlawful possession of a weapon, and was sentenced to probationary terms on the other convictions, which he violated in three cases and was sent to State prison. He also had nine disorderly person convictions for drug-related offenses, and was granted conditional discharge twice, with an extension of the program in one case, and discharged as

_____

[9] While the judgment only listed two aggravating factors, N.J.S.A. 2C:44-1(a)(3) and (9), "[t]he sentencing transcript," which listed three aggravating factors, "is 'the true source of the sentence.'" State v. Walker, 322 N.J. Super. 535, 556 (App. Div. 1999) (quoting State v. Pohlabel, 40 N.J. Super. 416, 423 (App. Div. 1956)). On remand, the trial judge should enter a corrected judgment of conviction, if warranted, after the Wade/Henderson hearing.

absconded in the other.  At the time of his arrest in this case, there was an active bench warrant for his arrest in New York for possession of CDS and he was on probation in Union County.  Thus, as the trial judge found, defendant had "what appears to be . . . a continuous period of being involved" in the justice system.

In making her determination, the trial judge did not apply aggravating factor two, N.J.S.A. 2C:44-1(a)(2), ("gravity and seriousness of harm inflicted on the victim")  explaining as follows:

> Having presided over the case, I note that it is clear, and it's very rare that I would ever use . . . the serious gravity, seriousness of harm inflicted on the victim, including whether the victim knew or reasonably should have known that the victim of the offense -- I don't think . . . it doesn't quite amount to the second . . . aggravating factor, but it is clear that this incident has had a devastating impact on this family.
>
> They are not quite functioning the same way because of this incident that took place in front of their children, and they will never function in the same way. And that's between them and their [G]od to figure out how they will work through it.  But it has had a devastating impact on the family and the family dynamics, of which I don't think there's a way that that's really going to be fixed except probably through counseling and through many other things.  But the impact was beyond the point of significant to the victims in this matter.

The judge concluded "the aggravating factors do outweigh the mitigating factors" and sentenced defendant to a term of ten years, subject to an eighty-five

52

A-5288-17

percent period of parole ineligibility pursuant to NERA, on count one. Count nine merged with count one.

B.

Our "review of a sentencing court's imposition of sentence is guided by an abuse of discretion standard." State v. Jones, 232 N.J. 308, 318 (2018). "Although '[a]ppellate review of sentencing is deferential,' that deference presupposes and depends upon the proper application of sentencing considerations." State v. Melvin, 248 N.J. 321, 341 (2021) (alteration in original) (quoting State v. Case, 220 N.J. 49, 65 (2014)). We will "affirm the sentence of a trial court unless: (1) the sentencing guidelines were violated; (2) the findings of aggravating and mitigating factors were not 'based upon competent credible evidence in the record;' or (3) 'the application of the guidelines to the facts' of the case 'shock[s] the judicial conscience.'" State v. Bolvito, 217 N.J. 221, 228 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364 (1984)). The first prong of the inquiry presents an issue of law that is reviewed de novo. State v. Robinson, 217 N.J. 594, 604 (2014).

The ordinary term for a second-degree offense is between five and ten years, N.J.S.A. 2C:43-6(a)(2), and thus defendant's sentence of ten years subject to the NERA, complied with the sentencing guidelines. Bolvito, 217 N.J. at 228.

53

In determining the appropriate sentence to impose within that range, judges "must identify any relevant aggravating and mitigating factors set forth in N.J.S.A. 2C:44-1(a) and (b) that apply to the case." Case, 220 N.J. at 64. "The finding of any factor must be supported by competent, credible evidence in the record." Ibid. "Whether a sentence should gravitate toward the upper or lower end of the range depends on a balancing of the relevant factors." Ibid.

Here, defendant argues the judge improperly considered his twenty-five prior arrests in finding aggravating factors three, six, and nine. However, the judge specifically set forth that she was not "tak[ing] into account the matters that have been dismissed and no-billed." Moreover, such consideration to support her findings on the aggravating factors three, six, and nine would not have been error because, "[a]dult arrests that do not result in convictions may be 'relevant to the character of the sentence . . . imposed.'" State v. Rice, 425 N.J. Super. 375, 382 (App. Div. 2012) (alteration in original) (quoting State v. Tanksley, 245 N.J. Super. 390, 397 (App. Div. 1991)).

Defendant's assertion to the contrary, in reliance upon State v. K.S., 220 N.J. 190, 199 (2015), is inapposite. In that case, the Court addressed whether a prosecutor, in rejecting an application for pretrial intervention, may consider a

defendant's prior dismissed charges, which were not "supported by undisputed facts of record or facts found at a hearing."  Ibid.

Similarly unpersuasive is defendant's argument that the judge erred in failing to consider, based on the jury's finding, the robbery was on the lower end of a second-degree crime because the victim suffered no physical injuries and the incident lasted only a few minutes.  However, there is no indication in this record that the judge improperly considered the more serious acquitted charges in deciding to impose a sentence in the highest range for a second-degree offense.  Melvin, 248 N.J. at 350 (explaining that consideration of acquitted charges in sentencing defies the principles of due process and fundamental fairness).  The judge focused only on defendant's lengthy past criminal history and did not, like in Melvin, make any findings as to the weapons charges for which defendant was acquitted.

That lengthy criminal conduct, beginning in 1993 when defendant was a juvenile, and continuing to the time of his arrest in this case, despite repeated attempted rehabilitation and punishment, supported the judge's finding as to aggravating factors three, six, and nine, because it presented a strong risk of re-offense and underscored the need to deter him from future criminal activity.  See

State v. Ross, 335 N.J. Super. 536, 543 (App. Div. 2000) (finding aggravating factors supported by the defendant's lengthy criminal history).

Last, defendant's argument that the judge, in effect, improperly applied aggravating factor two, N.J.S.A. 2C:44-1(a)(2), the "gravity and seriousness of harm inflicted on the victim," is not persuasive. The judge expressed sympathy for the victim and his family based on this incident, but specifically found that aggravating factor two did not apply in this case. [10]

We conclude defendant's sentence was in accord with the sentencing guidelines, was based on a proper weighing of the factors, and does not shock the judicial conscience.

Affirmed in part; reversed and remanded in part for further proceedings consistent with our opinion.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

_____

[10]  Factor two is not listed on the judgment of conviction.